UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KENNETH KEMP,
On behalf of himself and all others similarly
situated, and
CHRISTINE KEMP,

                              Plaintiffs,

v.                                                      CIVIL ACTION NO. 05-11516-GAO

GANICK, O'BRIEN & SARIN, Attorneys at
Law, LAWRENCE E. O'BRIEN, JR., d/b/a
GANICK, O'BRIEN & SARIN, Attorneys at
Law, and DOES 1-5,

                              Defendants.

## AFFIDAVIT OF ANNE ROBBINS

I, Anne Robbins, state as follows:

1.      I am an attorney at the firm of Lynch, Brewer, Hoffman & Fink, LLP and have

been licensed to practice law in the Commonwealth of Massachusetts since 1992.  I have been

a member of the bar of this Court since 1992.

2.      I have firsthand knowledge of the matters set forth in this affidavit.

3.      Attached to this affidavit are documents identified as Exhibits A – J.  I hereby

certify that these exhibits consist of true and correct copies of the following documents:

> Exhibit A:  Letter from Ganick, O'Brien & Sarin to Kenneth Kemp (attached as
> Exhibit B to plaintiffs' Second Amended Complaint in this action);
>
> Exhibit B:  Complaint, Performance Capital Management, Assignee in Interest
> for Chase Manhattan Bank vs. Kenneth Kemp and Christine M. Kemp,
> Middlesex Superior Court, Civ. A. No. 04-2946 (attached as Exhibit A to
> plaintiffs' Second Amended Complaint in this action);
>
> Exhibit C:  August 14, 2003 Credit Report for Kenneth J. Kemp (marked as
> Exhibit 5 at the Deposition of David Book)
>
> Exhibit D:  Pages 11-12, 20-22, 29-30, 33-34, 36-37, 39-40, 43-44 and 45-46
> from the Deposition of David Book;
>
> Exhibit E:  Pages 4 and 10 from the Deposition of Lawrence E. O'Brien, Jr.;

Exhibit F:  Pages 5-6, 8-11, 16-18, 40-41, 96-99, 119-20 and 139 from the Deposition of Kenneth Kemp;

Exhibit G:  Exhibits 2, 5 and 6 from the Deposition of Kenneth Kemp;

Exhibit H:  Pages 8 and 9 from the Deposition of Christine Kemp;

Exhibit I:  Kenneth Kemp's Answers to First Set of Interrogatories, Answer No. 23; and

Exhibit J:  Christine Kemp's Answers to First Set of Interrogatories, Answer No. 23

Signed under the pains and penalties of perjury,

October 23, 2006

Anne Robbins

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by electronic means on October 23, 2006.

/s/ Anne Robbins

2

**EXHIBIT A**

**GANICK, O'BRIEN & SARIN**
Attorneys At Law
161 Granite Avenue
Dorchester, MA 02124
(617)288-4050

RE: Performance Capital Management ,Inc.
BALANCE:$
Case No:  048413

Dear Mr. Kemp;

The above-entitled matter has been placed with our office for collection against you.  The balance owed by you is long overdue, and payment is requested.

If there is any reason why you cannot send us your check or money order at this time, we feel it is your duty to contact us at once so that we may set up a convenient payment schedule for you.

If you notify this office in writing within thirty (30) days that the debt, or any portion thereof, is disputed, we shall obtain verification of the debt or a copy of any judgment against you and will forward you a copy of such verification or judgment; unless within thirty (30) days after receipt of this letter you dispute the validity of the debt, or any portion thereof, the debt will be assumed to be valid.

Therefore, unless we hear from you within 30 days of the date of this letter, or you make satisfactory arrangements to pay this claim, we shall institute legal proceedings and, pending court approval, may make such attachment of your property, bank account or wages, as shall be necessary to satisfy the judgment and execution which our client expects to obtain against you.

Please send your check or money order to this office made payable to the order of Performance Capital Management

This is an attempt to collect a debt.  Any information obtained will be used for that purpose.

Very truly yours,

GANICK, O'BRIEN & SARIN

DAB/1

**EXHIBIT B**

.



COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.

01-2946

PERFORMANCE CAPITAL MANAGEMENT,   )
ASSIGNEE IN INTEREST FOR CHASE     )
MANHATTAN BANK                     )
         Plaintiff                 )
                                   )
                                   )
VS.                                )      COMPLAINT
                                   )
KENNETH KEMP AND                   )
CHRISTINE M. KEMP                  )
         Defendant                 )

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY

JUL 23 2004

CLERK

07/23/04 12:42H0000 9715 CLERK
                CIVIL
                SURCHARGE
                SECC
                   20
                        01296 #
                TOTAL 285 -
                CHECK

1.   The Plaintiff, Performance Capital Management, Inc, Assignee in Interest for Chase Manhattan Bank, is a duly organized corporation with its usual place of business at Anaheim, Orange County, California.

2.   The Defendant, Kenneth Kemp, is an individual presently residing at 9 Elizabeth Road, Billerica, Middlesex County, Massachusetts 01821.

3.   The Defendant, Christine M. Kemp, is an individual presently residing at 9 Elizabeth Road, Billerica, Middlesex County, Massachusetts 01821.

## COUNT I
### Monies Loaned

4.   The Defendant, Kenneth Kemp, owes the Plaintiff the sum of $18,360.96 for balance due for monies loaned, together with interest thereon from November 17, 2003, on or before which date demand for payment was made.

     WHEREFORE, Plaintiff demands judgment against the Defendant, Kenneth Kemp, in the sum of $18,360.96.

## COUNT II
### Fraudulent Transfer

5.   The Plaintiff hereby incorporates paragraphs 1 through 4.

6.   On or before September 25, 2003, the Defendant Kenneth Kemp, executed a deed which was recorded at the Middlesex County Registry of Deeds on October 30, 2003.

7.  Pursuant to the above referenced deed, the Defendant, Kenneth Kemp, transferred his interest in the real estate located at 9 Elizabeth Road, Billerica, Massachusetts to the Defendant Christine M. Kemp in return for consideration of $1.00. See Exhibit 1 attached.

8.  At the time of the transfer, the Defendant, Kenneth Kemp, was insolvent as defined by the Massachusetts General Law, Chapter 109, Section 3.

9.  The transfer was made without the Defendant, Kenneth Kemp, receiving a reasonable value in exchange for the real estate transferred.

10. The transfer constitutes a fraudulent transfer pursuant to Massachusetts General Law, Chapter 109, Section 5 and Section 6(a).

WHEREFORE, Plaintiff demands judgment against the Defendant Christine M. Kemp in the amount of $18,038.88 and requests the Court find the transfer of the real estate to be void.

                                    Plaintiff,
                                    By Its Attorney
                                    GANICK, O'BRIEN & SARIN


                          By: _____
                                    David A. Book, Esq.
                                    BBO#: 636011
                                    161 Granite Avenue
                                    Dorchester, MA 02124
                                    (617) 288-4050

Dated:  July 8, 2004

**EXHIBIT C**

PAGE 1    DATE  8-14-2003   TIME 11:31:49  V201  TMA1

KENNETH J KEMP
9 ELIZABETH RD
BILLERICA MA 018214425
RPTD: 4-93 TO 12-02 U 9X
LAST SUB: 1240000

SS: 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
DOB: 08/28/68
SP: K

E: KIM REAL ESTATE
RPTD: 10-00 TO 11-00 I

E: K &amp; M REAL ESTATE
RPTD: 10-00 I

*25 LINDSAY RD
BILLERICA MA 018214427
RPTD: 10-91 TO 11-95 U
LAST SUB: 2431570

*93 ELIZABETH RD
BILLERICA MA 018214426
RPTD: 3-01 TO 6-01 I
LAST SUB: 3900614

*4 ELIZABETH RD
BILLERICA MA 018214406
RPTD: 5-01 I
LAST SUB: 6108400



EXHIBIT 5
BOOK
DATE: 5-1-06
N. FLYNN BORELLI

------------------------ PROFILE SUMMARY ------------------------

| | | | |
|---|---|---|---|
| PUBLIC RECORDS-------0 | PAST DUE AMT-------$0 | INQUIRIES---1 | CNT 33/12/07/18 |
| INSTALL BAL----$13,784 | SCH/EST PAY-------$345 | INQS/6 MO---0 | SATIS ACCTS---9 |
| R ESTATE BAL-------$0 | R ESTATE PAY-------$0 | TRADELINE--14 | NOW DEL/DRG---2 |
| TOT REV BAL----$11,264 | TOT REV AVAIL------78% | PAID ACCT---7 | WAS DEL/DRG---3 |
| | | | OLD TRADE--6-89 |

-------------------------- TRADES --------------------------

| SUBSCRIBER SUB#  KOB TYP TRM ECOA ACCOUNT # | OPEN BALDATE LAST PD | AMT-TYP1 BALANCE MONTH PAY | AMT-TYP2 PYMT LEVEL PAST DUE | ACCTCOND MOS REV MAXIMUM | PYMT STATUS PYMT HISTORY BY MONTH |
|---|---|---|---|---|---|
| *DISCOVER FINANCIAL SVC 3276502 BC CRC REV  1 601100188006 SOLD TO: NACC ** PURCHASED BY ANOTHER LENDER ** | 12-90 2-19-00 2-00 1-800-377-5935 | $8,400-H | 12-98 | CHARGOFF (23) | DELINQ 60 LLLLLLLLLLLLLL LL211CCCCC |
| *CHASE NA 1270583 BC CRC UNK  1 425331168036 SOLD TO: CHEM BK/SOLD TO PCM 05/00 ** TRANSFERRED TO ANOTHER LENDER ** | 3-94 7-15-00 7-99 | $9,726-C $9,726 | 7-00 | ( 1) L | CHARGOFF |

+++++ MORE

AGE 2    DATE  8-14-2003   TIME 11:31:49  V201  TMA1

| SUBSCRIBER SUB#  KOB TYP TRM ECOA ACCOUNT # | OPEN BALDATE LAST PD | AMT-TYP1 BALANCE MONTH PAY | AMT-TYP2 PYMT LEVEL PAST DUE | ACCTCOND MOS REV MAXIMUM | PYMT STATUS PYMT HISTORY BY MONTH |
|---|---|---|---|---|---|
| JSTRUST 1880790 FS R/C 30Y  2 32288015580393 ** TRANSFERRED TO ANOTHER LENDER ** | 3-93 4-29-00 | $117,900-O | 4-00 | TRANSFER (21) | PAID B-8-2----C2C- 1CC111C1 |
| HASE 290016 BC CRC REV  1 | 12-90 9-23-02 | $10,000-L $0 | $8,361-C | CLOSED | CHARGOFF |

SOLD TO: PORTFOLIO RCV 800-317-0023
** PURCHASED BY ANOTHER LENDER **

*GENERAL MOTORS MTG COR      12-92    $92,000-O
2993959 FM R/C 30Y  1  2-28-03                              PAID    CUR WAS 90
220606412                                    2-03           (99) BCCCCCCCCCCCCC
                                                            6-00/3  CCCCCCCCCC1C

*FIRST NATIONWIDE MTG        3-93    $117,900-O
3828437 FS R/C 30Y  2  2-28-03                              PAID   CUR WAS 30-4
5770022587844                                2-03           (32) BCCCCCCCCCCCC
                                                            1-01/1  CCCCCCCCCCC1

 AMERICREDIT                 5-01     $12,000-O
3963206 FA AUT  60  1  4-20-02                              PAID    CURR ACCT
412075962                                    4-02           (12) BCCCCCCCCCCC

*NATL TIRE &amp; BATTERY/HS    6-93     $1,800-L
1326510 AT CHG REV  1  7-01-00                              PAID    CURR ACCT
601154920058183                              7-00           (36) B000000000000
** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **                 000000000000

 G M A C                     11-89     $5,595-O
1610003 FF AUT  48  7  12-02-93          $0                 PAID    CURR ACCT
3170704675                                   12-93          (50) B

 DOVENMUEHLE MORTGAGE        3-93    $117,900-O
2990990 FM R/C 30Y  2  7-05-00                                             PAID
3100013836234                                7-00           ( 1) B

 FLEET NATIONAL BANK         6-93     $1,000-L    $995-H    OPEN    CURR ACCT
1160021 BB C/C LOC  4  7-31-03          $0       7-03       (99) 0000000000000
3455                   4-01                                      000000000000

+++++ MORE

PAGE 3    DATE  8-14-2003  TIME 11:31:49  V201  TMA1

| SUBSCRIBER SUB# | KOB TYP TRM ECOA | OPEN BALDATE LAST PD | AMT-TYP1 BALANCE MONTH PAY | AMT-TYP2 PYMT LEVEL PAST DUE | ACCTCOND MOS REV MAXIMUM | PYMT STATUS PYMT HISTORY BY MONTH |
|---|---|---|---|---|---|---|

AMERICAN HONDA FINANCE      10-02    $16,995-O
1600834 FA AUT  60  1  7-31-03       $13,784                OPEN    CURR ACCT
110449885580001        7-03            $313      7-03       (10) CCCCCCCCCC

CITI                        6-89     $6,050-L
1240000 BC CRC REV  3  7-25-03        $1,538                OPEN    CURR ACCT
542418102606          7-03             $32       7-03       (99) CCCCCCCCCCCCC
                                                                CCCCCCCCCCCCC

MBGA/JC PENNEY              11-90      $219-H
3321860 DC CHG REV  1  5-03-96          $0       11-92    INACTIVE  CURR ACCT
302465430             10-92                                 (66) NNNNNNNNNNNNN
                                                                NNNNNNNNNNNNN

--------------------------- INQUIRIES -------------------------------------
FIRST AMERICAN CREDCO  10-03-02  3996938 FR        UNK R/E

**EXHIBIT D**

Page 1

Volume I
Pages 1 - 57

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11516-GAO

KENNETH KEMP,
On behalf of himself and
all the others similarly
situated, and CHRISTINE KEMP,
    Plaintiffs,
    vs.
GANICK, O'BRIEN & SARIN,
Attorneys at Law,
LAWRENCE E. O'BRIEN, d/b/a
GANICK, O'BRIEN & SARIN,
Attorneys at Law,
And DOES 1 - 5,
    Defendants.

*   *   *   *   *   *   *

DEPOSITION of DAVID ALLEN BOOK, ESQ., called as
a witness by counsel for the Plaintiff, pursuant to
the applicable provisions of the Massachusetts Rules
of Civil Procedure, before Norma Flynn Borelli, CSR
No. 102793, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, taken at the offices of Kenneth Quat,
Esq., 9 Damonmill Road, Concord, Massachusetts, on
Monday, May 1, 2006, commencing at 1:30 PM.

***********************

FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303  *  (617) 536-2727
TOLL FREE: (888) 244-8858
FAX:  (508) 752-4611

***********************

DUPLICATE

1      Q.   Your signature isn't on the complaint in

2   those cases?

3      A.   It depends.   It depends what type of

4   complaint it is.   Or what the extent of the work on

5   the complaint was.

6      Q.   Give me a sense, what are the circumstances

7   under which you personally would sign an initial

8   complaint that's filed in court?

9      A.   If it falls outside of a regular case that

10   we handle.   If it's not for money or services owed,

11   something particularly different from an average

12   case, a single account, so to speak.

13      Q.   I'm not sure I grasp that.   If you need me

14   to ask it a different way.

15      A.   I am not sure exactly what you are asking

16   for, Counselor.

17      Q.   Let me approach it a different way.   Do you

18   typically sign complaints for your law firm that are

19   collections on credit card accounts?

20      A.   No, I don't.

21      Q.   Is there a particular lawyer or lawyers in

22   the firm who do sign those complaints?

23      A.   All the complaints are generally reviewed

24   by the managing partner.

Page 12

Q.   And that is?

A.   Lawrence O'Brien.

Q.   Does that mean he also signs them on behalf
of the firm?

A.   Most occasions, yes.

Q.   Are there any other attorneys in your
office currently who will sign credit card
collection complaints?

A.   It depends.  Generally Larry will sign
almost all the complaints.

Q.   Mr. O'Brien?

A.   Mr. O'Brien.  Mr. O'Brien will sign most of
the complaints.  On some occasions I draft the
complaint or I have input in the drafting, my name
goes on it.

Q.   Does your firm primarily represent
creditors in collection cases?

A.   Yes.

Q.   Does your firm ever represent debtors in
collection cases?

A.   Not to my knowledge.  On a rare occasion,
perhaps.  I'm not aware of any.

Q.   Do you happen to know as a percentage,
let's start with dollar volume, what percent of the

Page 20

1    out to my office?

2        A.   Yes, I did.

3        Q.   It looks like you didn't sign it.

4        A.   That's correct.

5        Q.   Do you know who did sign it?

6        A.   Upon my instruction, I believe one of the

7    secretaries did.  I reviewed an earlier copy, made

8    one change.  I was in court, I knew there was a time

9    issue, so I asked them to read it back to me and

10   just send it, forward it to you.

11       Q.   Okay.  You approved everything that was in

12   this letter before it went out?

13       A.   Correct.

14       Q.   If you could direct your attention, please,

15   about halfway through the first paragraph, the

16   sentence that begins, "In addition, I have enclosed

17   a copy of the original demand letter."

18            Do you see that sentence?

19       A.   I'm sorry.  Yes.

20       Q.   If you could now turn to Exhibit B to the

21   Complaint.

22       A.   Sure.

23       Q.   My question to you is whether Exhibit B is

24   a copy of the original demand letter that you

Page 21

1   referenced in Exhibit C.

2       A.  The wording I chose is probably a little

3   bit loose.  This would be the initial demand letter

4   that would be sent out.

5       Q.  You are talking about Exhibit B to the

6   Complaint?

7       A.  Correct.

8       Q.  In your letter that is Exhibit C to the

9   Complaint, you say, "I have enclosed a copy of the

10  original demand letter forwarded to Mr. Kemp on

11  November 17, 2003, with an initial balance of

12  18,481.83."

13          Is there anything that's inaccurate about

14  that sentence I just read to you?

15      A.  I can't be absolutely certain about the

16  date, nor the amount in question.  I don't recall

17  what the initial demand amount would be.

18      Q.  But at the time you approved Exhibit C, you

19  believed that information to be accurate, correct,

20  the date and the amount?

21      A.  I believe so, correct.

22      Q.  What I am a little confused by is what you

23  said a minute ago.  You weren't sure about something

24  about Exhibit B.

Page 22

1    A.    Okay.    If I can clarify.    Basically, as I

2   explained in the last paragraph, we don't keep

3   originals of the demand letters with the file.    So

4   basically I requested that one be printed for you

5   because I assumed you were interested in what was

6   contained in the body.    As such, I had a duplicate

7   printed, and the information contained within the

8   body would be provided to you.

9    Q.    I think I understand.    In other words,

10   Exhibit B the Complaint is not a copy of a

11   particular letter that went out, correct?

12    A.    Correct.

13    Q.    But in a sense, for lack of a better term,

14   it's a form letter, the substance of which was used

15   -- now I'm getting hung up.

16    Let me ask it this way:    Except for

17   specific information such as the name of the debtor

18   and the balance and the debtor's address, is Exhibit

19   B the letter that was sent to Mr. Kemp as part of

20   the initial demand made in this case?

21    A.    Yes.

22    Q.    As far as you know, is the letter that is

23   represented by Exhibit B, the first communication

24   from the Ganick law firm to Mr. Kemp about this

Page 29

1    ever signed an initial demand letter, other than

2    Mr. O'Brien?

3        A.  No.

4        Q.  If you could please look at Exhibit A to

5    Exhibit 1.

6        A.  Yes.

7        Q.  Do you see that?

8        A.  Yes.

9        Q.  Do you recognize that two-page document?

10       A.  That is a complaint filed at the Superior

11   Court regarding Performance Capital versus Kenneth

12   and Christine Kemp.

13       Q.  Do you know who prepared this particular

14   document?

15       A.  I did.

16       Q.  Did anyone instruct you to prepare it?

17       A.  I don't remember.  I would have probably

18   spoken to Attorney O'Brien about the matter, and he

19   would have instructed me just to draft a complaint.

20       Q.  When you say "spoken to Attorney O'Brien

21   about the matter," do you mean essentially the

22   status of the matter?  What do you mean by that?

23       A.  Both.  There was an initial settlement

24   discussion before your representation of the Kemps.

Page 30

When he refused the settlement agreement, we went

forward with the suit.  Since there was an issue

regarding this case of fraudulent transfer, I would

have spoken to Attorney O'Brien before I prepared a

Complaint in the Superior Court that included both

Count 1 and Count 2.

Q.  Do I gather from your answer that if there

hadn't been an issue of fraudulent transfer, you

wouldn't have spoken to Attorney O'Brien?

A.  I would have then basically requested --

I'm sorry.  Still having already negotiated a

settlement with your client previously?

Q.  Correct.  Everything else becoming the

same.

A.  I would have requested to file suit on the

matter.

Q.  Would you then have had any discussions

with Mr. O'Brien about whether to file suit?

A.  He would make the final determination on

the matter.  The Complaint would have been issued

and he would have signed it.

Q.  You signed this particular Complaint,

correct?

A.  Correct.

Page 33

1    A.   I believe so.  I know they bought different

2    addresses.  I believe that was the original address.

3    Q.   Directing your attention to Paragraph 7 of

4    the Complaint, does that help refresh your memory?

5    A.   Yes.

6    Q.   In Paragraph 8 of the Complaint, there is

7    an allegation that Kenneth Kemp was insolvent at the

8    time of the transfer, correct?

9    MR. HOLLAND:  Objection.

10   A.   If I'm reading Paragraph 8, that is what it

11   states.

12   Q.   On what facts or circumstances did you base

13   the allegation in Paragraph 8 of the Complaint, that

14   Mr. Kemp was insolvent?

15   A.   Actually, do you have the statute

16   available?

17   Q.   Sure.

18   MR. QUAT:  Mark this as exhibit --

19   hold on.  I am not sure I have the section you are

20   going to need.  I can give you a couple.

21   Let's mark these as Exhibit 2 and Exhibit

22   3.

23   (Exhibits Nos. 2 and 3 marked for

24   Identification.)

Page 34

1          MR. QUAT:  Let's mark this as

2    Exhibit 4.

3                (Exhibit No. 4 marked for

4    Identification.)

5        A.  Basically, according to Massachusetts Law,

6    Section 109A, Section 3, a debtor is insolvent if

7    the sum of the debtor's debts is greater than all

8    the debtor's assets at fair valuation.

9            At the time the property was transferred,

10   that I recall, Mr. Kemp transferred, for the sum of

11   $1, there was an outstanding mortgage for, I believe

12   somewhere around 100,000, then another subsequent

13   mortgage for over 200,000.  His name was on both

14   mortgages, but he transferred his equity in the

15   property to his wife for a dollar.

16           In addition, I believe -- I'm trying to

17   remember -- having no equity in the property, he is

18   now encumbered by several hundred thousand dollars

19   of debt.

20           In addition, according to the credit

21   bureau, he had two charge-offs to Chase, being he

22   had not paid those bills, and one to Discover Card.

23   As such, basically on three consumer accounts he

24   wasn't paying at the time, and were now basically in

Page 36

1    of the transfer of that property?

2        A.    No.

3        Q.    Okay.    What debts did Mr. Kemp have at the

4    time of the transfer of that property?

5        A.    As I said, at the time of the transfer of

6    the property, according to the credit bureau, he had

7    two accounts owed to Chase and one to Discover Card

8    that were not paid that were now charge-off

9    accounts.

10       Q.    Okay.    Did he have any other debts, as far

11   as you can recall?

12       A.    As I said, I believe the credit bureau

13   indicated an outstanding loan to GMAC, which he was

14   paying late.

15       Q.    At the time of the transfer, do you know

16   what the value of Mr. Kemp's assets taken together

17   was?

18       A.    No, I do not.

19       Q.    At the time you drafted the Complaint that

20   is Exhibit 1, did you know what the total value of

21   Mr. Kemp's assets were at the time of the transfer?

22       A.    No, I did not.

23       Q.    At the time you drafted the Complaint, did

24   you know what the total amount of Mr. Kemp's debts

Page 37

1    were at the time of transfer?

2        A.   I knew he was responsible for the mortgage

3    notes outstanding and the balances as indicated on

4    his credit bureau report.

5        Q.   Okay.

6        A.   And of course my client's bill as well.

7        Q.   In the course of drafting the Complaint

8    that is Exhibit A to Exhibit 1, did you do any

9    addition or mathematical computations to compare the

10   value of Mr. Kemp's assets to his debts?

11       A.   Since the client, Mr. Kemp, indicated that

12   he was having money problems at some point during

13   some initial conversation he had with one of the

14   staff attorneys, and the fact that he basically

15   transferred all the equity in the property out for a

16   dollar, and he basically had three credit cards that

17   were now in default, I didn't have any other

18   information to go on.

19       Q.   Is the answer to my question no?

20       A.   No.   Sure.

21       Q.   You alluded to some statement regarding

22   money problems that Mr. Kemp made to a staff

23   attorney.

24       A.   Correct.

Page 39

1    took into consideration in drafting the fraudulent

2    transfer count of the Complaint, was the fact that

3    Mr. Kemp was apparently not current on some credit

4    card debt, correct?

5        A.   Yes.   There were two charge-offs to Chase,

6    one being the origin of this debt, one to Discover

7    Card, and there was a series of late payments on a

8    couple of his other accounts.

9        Q.   One of them being mentioned was GMAC?

10       A.   I believe so.

11       Q.   General Motors Acceptance Corporation?

12       A.   You know, good question.   I'm not sure.

13       Q.   At the time of the transfer that is the

14   basis of the fraudulent transfer claim, to your

15   knowledge, based on the knowledge you had at the

16   time, was Mr. Kemp current with any of his debts?

17       A.   I'm not sure.   I have not seen the credit

18   bureau report since I drafted this.

19       Q.   You did consult the credit report before

20   you drafted the Complaint, correct?

21       A.   It's one of the tools I used, correct.

22                 MR. QUAT:   Next exhibit as Exhibit

23   5.

24                 (Exhibit No. 5 marked for

Page 40

1    Identification.)

2    **Q.** This is Exhibit 5. I will represent to you

3    this is a document that was produced by Attorney

4    Holland in this case. My initial question to you

5    is, do you recall seeing this document before?

6    **A.** I believe this is the credit report that is

7    contained within Mr. Kemp's file.

8    **Q.** Is this the credit report you were

9    referring to in your answers to the most recent

10   questions?

11   **A.** I believe so, yes.

12   **Q.** The question that we left off on, I

13   believe, was my asking you if at the time of the

14   transfer, Mr. Kemp was current in paying any of his

15   debts. If you can determine the answer to that

16   question from this document, that's what I would

17   like to hear from you.

18   **A.** It looks like he was current with America

19   Honda Finance. Citi. I am assuming it's Citi

20   Financial. And his GMAC was current.

21   **Q.** Have you fully answered the question?

22   **A.** I have answered the ones that say "current

23   account."

24   **Q.** Okay. Just to get it into the record, the

Page 43

Q.  Going back to the first page of this
exhibit, you had mentioned in your testimony that
there was a problem with the Discover Card.  Is it
fair to say that appears about halfway down the
first page?

A.  Yes.

Q.  Can you tell from looking at that
information, what the status was regarding that
particular account, the Discover account?

A.  It indicates it's a charge-off account
purchased by another lender.

Q.  The next account down the page is Chase N.

A.  That indicates a charge-off also.  It was
sold to another lender, or transferred to another
lender.

Q.  In fact, it says "Sold to PCM," correct?

A.  Correct.

Q.  And "PCM" is the entity that the Ganick
firm represented in the Complaint that is Exhibit A
to Exhibit 1, correct?

A.  Correct.

Q.  Then the next creditor which appears on
Page 1 is U.S. Trust, correct?

A.  Correct.

Page 44

Q.  What does the status of that account appear
to be to you?

A.  It looks like he transferred it to another
lender and subsequently paid.

Q.  Any indication of a delinquency or
charge-off on that?

A.  No.

Q.  I don't know about your copy, but my copy
is kind of cut off.  There is another Chase account,
and that indicates a charge-off, correct?

A.  Correct.

Q.  At the time you drafted the Complaint that
is Exhibit A to Exhibit 1, do you know whether or
not Mr. Kemp was behind in any of his utility
payments?

A.  No, not aware.

Q.  Okay.  What is the date that Exhibit 5 was
prepared?  According to the language on there, can
you tell from looking at Exhibit 5 when it was
prepared?

A.  It looks like the request was dated
8/14/2003.

Q.  When you say "the request," what do you
mean?

Page 45

1      A.   Any time you request a credit report, it's

2   done electronically.   It's a request done in this

3   case by our client.   They probably printed it from

4   the original file.   I wouldn't know, other than

5   that.

6      Q.   Do you know as of what date this report is

7   current by looking at it?

8      A.   As of 8/14/2003.   I'm not sure how this

9   particular credit reporting agency, how far behind

10   they are on the dates.

11      Q.   I understand.   Is it fair to say the

12   request was made and the report was generated both

13   on the same date?

14      A.   Most likely, yes.

15      Q.   Okay.   At the time you prepared the

16   Complaint which is Exhibit A to Exhibit 1, did you

17   have any other credit reports regarding Mr. Kemp,

18   other than Exhibit 5?

19      A.   No.

20      Q.   At the time you prepared Exhibit A to

21   Exhibit 1, did you have any other information

22   regarding the status of any of Mr. Kemp's debts,

23   other than the information that appears on Exhibit

24   5?

Page 46

1    A.   Well, I had basically the fact the

2  mortgages were outstanding.   The mortgages on the

3  property of 9 Elizabeth Road were outstanding at the

4  time that the Complaint was prepared.

5    Q.   When you say "outstanding," you mean money

6  was owed on them?

7    A.   They weren't paid.   There was no discharge

8  filed on any of the mortgages in question for that

9  property.   So his debt, also in addition, transfer

10 did occur, so any equity in the property was now

11 gone.

12   Q.   Right.   At the time you prepared Exhibit A

13 to Exhibit 1, did you know whether or not the actual

14 monthly payments on those mortgages were up-to-date

15 on not?

16   A.   I honestly do not know, nor did I feel it

17 that significant.

18   Q.   Okay.   Other than the information that you

19 relied on in Exhibit 5 at the time you prepared

20 Exhibit A to Exhibit 1, did you have any other

21 information regarding the payment status of any of

22 Mr. Kemp's other debts?

23   A.   Aside from the one for our client he wasn't

24 paying?

**EXHIBIT E**

1

Volume I
Pages  1 - 20

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

KENNETH KEMP,
On behalf of himself and all others
similarly situated, and
CHRISTINE KEMP,
    Plaintiffs,

                          Civil Action No.:

       vs.            05-11516-GAO

GANICK, O'BRIEN & SARIN, Attorneys at Law,
LAWRENCE E. O'BRIEN, JR., d/b/a
GANICK, O'BRIEN & SARIN, Attorneys at Law,
And DOES 1-5,
    Defendants.

_____


\* \* \* \* \* \* \*

**DEPOSITION OF LAWRENCE E. O'BRIEN, JR.,**
called as a witness by counsel for the Plaintiffs,
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure, before Judith A. Loconto,
Professional Court Reporter and Notary Public in and
for the Commonwealth of Massachusetts, taken at the
Law Office of Kenneth D. Quat, 9 Damonmill Square,
Suite 4A-4, Concord, Massachusetts, on Wednesday,
June 14, 2006, commencing at 1:46 p.m.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FLYNN REPORTING ASSOCIATES**
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts  01608
(508)  755-1303   (617)  753-2727
FAX:  (508)  752-4611
TOLL FREE:  (888)  244-8858

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DUPLICATE

1        Q.   So you know if you don't understand any

2   question of mine, you should free feel to ask me to

3   repeat or --

4        A.   I do.

5        Q.   Is there any reason why you can't give

6   complete or accurate testimony today?

7        A.   No.

8        Q.   You're an attorney?

9        A.   Yes.

10       Q.   You've been licensed in Massachusetts for

11  how long?

12       A.   Since 1975.

13       Q.   Are you licensed in any other

14  jurisdictions?

15       A.   No.

16       Q.   What's your current employment?

17       A.   Self-employed.

18       Q.   That's with the firm of Ganick, O'Brien &

19  Sarin?

20       A.   Yes.

21       Q.   That's a firm that you own?

22       A.   Yes.

23       Q.   How long have you owned the firm?

24       A.   Well, I've been in private practice by

1    changed, depending on a lot of different factors.

2         I certainly would have and did have some

3    input to it.

4         Q.  Is the Ganick standard initial demand

5    letter the same today as it was in November of 2003,

6    to your knowledge?

7         A.  No.

8         Q.  Can you tell me what has changed?

9         A.  As a result of this lawsuit brought by your

10   office, I changed, I believe, the wording in

11   Paragraph 4.

12        I think we eliminated any references --

13   this is off the top of my head.  I don't have any of

14   them with me -- we eliminated any reference to bank

15   accounts, wages, and property.

16        And I believe it just says something to the

17   effect of pending court approval -- well, I don't

18   want to guess, but that's where the change was made.

19             MR. QUAT:  I would like to ask for

20   a copy of that.  I acknowledge that it may not be

21   admissible, but I think I'm entitled to it.

22             MR. HOLLAND:  I will respond to

23   that.  I have to think about that, but I'll let you

24   know in a day or two.

**EXHIBIT F**

1                            Volume:  I

2                            Pages:  1-144

3                         Exhibits:  1-6

4           UNITED STATES DISTRICT COURT

5            DISTRICT OF MASSACHUSETTS

6           Civil Action No. 05-11516-GAO

7 - - - - - - - - - - - - - - - - - - - - - -

8 KENNETH KEMP, ON BEHALF OF HIMSELF AND ALL

9 OTHERS SIMILARLY SITUATED, and

10 CHRISTINE KEMP,

11                Plaintiffs,

12      v.

13 GANICK, O'BRIEN & SARIN, ATTORNEYS AT LAW,

14 LAWRENCE E. O'BRIEN, JR., d/b/a GANICK,

15 O'BRIEN & SARIN, ATTORNEYS AT LAW and DOES

16 1-5,

17            Defendants.

18 - - - - - - - - - - - - - - - - - - - - - -

19          Deposition of Kenneth Kemp

20      July 7, 2006   9:36 a.m. - 1:03 p.m.

21      Lynch, Brewer, Hoffman & Fink, LLP

22          101 Federal Street

23        Boston, Massachusetts

24     Reporter:  Daria L. Romano, RPR/CRR

Kenneth Kemp

5

1    Q.    Do you have any present plans to move

2    from that address?

3    A.    No.

4    Q.    Who do you live at 31 Hattie Lane

5    with?

6    A.    My wife and kids.

7    Q.    How many children do you have?

8    A.    Three.

9    Q.    And how long have you lived at 31

10    Hattie Lane?

11    A.    It will be three years, I think --

12    three years in October.  I think it was, like,

13    the 15th or the 30th.  October of '03, since

14    October of '03.

15    Q.    Are you currently employed?

16    A.    Yes.

17    Q.    Where are you employed?

18    A.    NRT, Waltham.

19    Q.    What is NRT?

20    A.    National Realty Trust.  They own

21    Coldwell Banker Residential Brokerage, but

22    they're owned by NRT.  That's who I contract

23    with.

24    Q.    What's your position?

Kenneth Kemp

6

1    A.    Real estate training.

2    Q.    Are you a W-2 employee or an --

3    A.    1099.

4    Q.    -- independent contractor?

5    A.    Yeah.

6        MR. QUAT:  Just make sure you let

7    him finish the question.

8        THE WITNESS:  Okay.

9        MR. QUAT:  And that helps you and

10   also helps the stenographer.

11       THE WITNESS:  Okay.

12   BY MR. HOLLAND:

13   Q.    How long have you been employed by or

14   employed with NRT?

15   A.    Technically they own -- they're owned

16   by Sundant which owns Century 21 ERA Coldwell

17   Banker, so I've been under that group off and on

18   for, you know, 10 years, but with Coldwell

19   Banker specifically a year and a half, maybe two

20   years.

21   Q.    What do you mean by off and on for 10

22   years?

23   A.    I worked for different real estate

24   companies within that.

Kenneth Kemp

8

1    Q.    And just seminars, is that what you're
2   referring to?

3    A.    Different courses, yeah.  And I did
4   some -- I have a teaching certificate to teach.

5    Q.    When did you receive your teaching
6   certificate?

7    A.    It was, like, '92.

8    Q.    And where did you teach high school?

9    A.    Dover-Sherborn.

10    Q.    And did you teach in a particular
11   subject or subjects?

12    A.    Special ed.

13    Q.    Does the fact that you received your
14   teaching certificate in 1992 refresh your memory
15   at all as to when the two years that you taught
16   at Dover-Sherborn were?

17    A.    Not really.  But I'm pretty sure it
18   was before my second son was born, and he's
19   eight, so it was probably a good seven, eight
20   years ago.

21    Q.    Okay.  What the are the ages of your
22   other two children?

23    A.    10 and four.

24    Q.    Now, going back to your current

Kenneth Kemp

9

1   employment.  You are a trainer.  Could you tell

2   me what that means?

3        A.    I teach various real estate courses

4   for Coldwell Banker Residential Brokerage.

5        Q.    For their agents and brokers?

6        A.    Correct.

7        Q.    And do you have a set schedule as to

8   when and how often you work for them?

9        A.    Yes.

10       Q.    What is your schedule?

11       A.    I book it pretty much for the year for

12   my regular classes, and then as classes come up,

13   I do them.

14       Q.    How many hours a week do you work for

15   them?

16       A.    It varies.

17       Q.    How are you compensated?

18       A.    Per the class.

19       Q.    And how much are you compensated per

20   class?

21       A.    It depends on the class.

22       Q.    Do you know how much you earned in

23   2005?

24            MR. QUAT:  In total?

Kenneth Kemp

10

1          MR. HOLLAND:  In total.

2     A.    I'd have to look back.

3     Q.    Can you tell me approximately?

4     A.    70,000 maybe.

5     Q.    Do you have any current employment

6  with anyone other than NRT?

7     A.    In terms of training?

8     Q.    Yes.

9     A.    No.

10    Q.    Do you do anything else?

11    A.    I do some brokerage deals.

12    Q.    What do you mean by that?

13    A.    I can do my own, you know, real estate

14  deals, if I have a deal here or there, but I'm

15  not engaged -- my main business is training.

16    Q.    Do you hold any licenses?

17    A.    I'm a certified real estate

18  instructor, which I don't think it's a license,

19  it's just a test you take and pass.

20    Q.    You don't have a broker's license?

21    A.    I do have a broker's license also,

22  yes.

23    Q.    When did you receive your broker's

24  license?

Kenneth Kemp

11

1        A.    Nine, 10 years ago.

2        Q.    Since 2000, have you earned any income

3   other than as a real estate trainer or as a

4   broker or agent?

5        A.    Rental income.

6        Q.    Anything else?

7        A.    No.

8        Q.    On what property or properties do you

9   own rental income?

10       A.    A property in Quincy.

11       Q.    And where is that located?

12       A.    Quincy.

13       Q.    Where?

14       A.    Oh.  The address is Ridgefield Street.

15       Q.    Ridgefield Street?

16       A.    Yes.

17       Q.    What type of property is it?

18       A.    It's a multifamily.

19       Q.    How many units?

20       A.    Three.

21       Q.    When did you acquire this property?

22       A.    I'm taking a guess.  Early '90s.

23       Q.    And do you own it in your own name?

24       A.    No.

Kenneth Kemp

16

1    Q.    At some point after you were married,
2    was any transfer in the title made?
3    A.    Yes.
4    Q.    When?
5    A.    I want to say within a year after we
6    were married.
7    Q.    Okay.  And what was the transfer that
8    was made?
9    A.    Kenneth Kemp and Christine Coveney to
10   Kenneth Kemp, Christine Kemp, joint tenancy,
11   tenants by the entirety.
12   Q.    When you purchased the property in
13   March of 1993, do you recall how much you paid
14   for it?
15   A.    131,000.
16   Q.    And did you obtain some financing in
17   connection with that purchase?
18   A.    Yes.
19   Q.    Do you recall how much financing you
20   got in connection with that purchase?
21   A.    Yes.
22   Q.    How much?
23   A.    117,900.
24   Q.    Now, after the property at 9 Elizabeth

Kenneth Kemp

17

1    Road was transferred to you and your wife as

2    tenants by the entirety, was the property

3    subsequently transferred?

4         A.    Meaning?

5         Q.    Was there any other change in title?

6         A.    After that time period?

7         Q.    Yes.

8         A.    Yes.

9         Q.    When was the next change in title?

10        A.    I'm not sure of the exact date.

11        Q.    Can you tell me approximately when it

12   was?

13        A.    I want to say it was about a month

14   before we got Hattie Lane maybe.

15        Q.    And what was that transfer?

16        A.    Meaning what was the transfer?

17        Q.    You and your wife as tenants by the

18   entirety to --

19        A.    To Christine as the sole owner.

20        Q.    Now, what was the stated consideration

21   for that transfer?

22              MR. QUAT:  Object to the form.

23        A.    I'd have to look at the document.

24        Q.    You don't know?

Kenneth Kemp

18

1    A.   No.

2    Q.   Did your wife pay you any money in

3  return for your ownership interest in that

4  property?

5    A.   I would have to look at the form, how

6  it was transferred exactly.

7    Q.   Do you recall that your wife gave you

8  any money?

9    A.   A lump sum, no.

10    Q.   Did she give you anything other than a

11  lump sum?

12    A.   I think a dollar changed hands, that's

13  it.

14    Q.   In September and October of 2003, did

15  you and your wife have separate bank accounts?

16    A.   Yes.  Actually, I think I have a

17  separate -- I think we both did at one time, but

18  I think when our bank got bought out, I went on

19  one.  So I'm not sure of the exact dates, but I

20  do have one separate account.

21          MR. QUAT:  Slow down.  He's only

22  asking about two specific months.

23    A.   I'm not sure.

24          MR. QUAT:  You should confine your

Kenneth Kemp

40

1    Q.    As of February of 2003, did you have

2    any unpaid, overdue debt other than the Chase

3    card that you never paid off?

4    A.    I don't believe so.

5    Q.    And is that also true as of November,

6    December of 2003?

7    A.    Any debt that hasn't been paid off?

8    Q.    Overdue, unpaid debt other than that

9    Chase card?

10    A.    That's it.

11    Q.    And is that true until today?

12    A.    Correct.

13    MR. QUAT:  I would jump in and say

14    that that Chase account has been resolved as of

15    today.

16    MR. HOLLAND:  That's true.  I would

17    agree to that statement.

18    BY MR. HOLLAND:

19    Q.    There's no other debt as of --

20    A.    That's not current, right.

21    Q.    Now, at the time that you transferred

22    the Elizabeth Road property to your wife, that

23    was September, October of 2003?

24    A.    Correct.

Kenneth Kemp

41

1     Q.   Now, prior to the transfer, the

2    property was held by the two of you as tenancy

3    by the entirety, correct?

4     A.   Correct.

5     Q.   What the reason that you transferred

6    the ownership interest to your wife?

7     A.   Looking to buy another house.

8     Q.   And, again, you believed that you

9    could get a lower interest rate by having the

10   house held solely in your wife's name?

11     A.   Correct.

12     Q.   And you received $1 from your wife for

13   that transfer; is that right?

14     A.   Correct.

15     Q.   Now, at the time of that transfer,

16   were there any mortgages on the Elizabeth Road

17   house?

18     A.   No.

19     Q.   Immediately prior to the transfer,

20   were there any mortgages on the Elizabeth Road

21   house?

22     A.   Meaning -- what's immediate?

23     Q.   The day before?

24     A.   No.

Kenneth Kemp

96

1     Q.    Was it some time in 2006?

2     A.    Yes.

3     Q.    Okay.  Now, do you see the entry dated

4  December 16, 2003 beginning with the words D

5  calls?

6     A.    Yep.

7     Q.    Can you read through the entry for

8  that date to yourself, and after you've done so

9  tell me whether you believe that anything

10 contained in there is an inaccurate description

11 of the first telephone call that you had with

12 the Ganick, O'Brien & Sarin's firm?

13         MR. QUAT:  Object to the form.  And

14 he could answer, if he can.

15         The D relates to the witness, correct?

16         MR. HOLLAND:  Correct.

17         MR. QUAT:  So --

18         MR. HOLLAND:  D is you.

19         MR. QUAT:  Right.  I still object

20 to the form.

21         But you can take your time and answer

22 if you can.

23     A.    Could you repeat the question?

24     Q.    Sure.  I would like you to read

Kenneth Kemp

97

1    through the entry which is a description of the

2    telephone call between you and the Ganick,

3    O'Brien & Sarin's firm and tell me if you

4    believe that any part of that description is

5    inaccurate?

6                    MR. QUAT:  And also, for the

7    record, the word I, the capital I that appears

8    there refers to, I think, Attorney McCaughey,

9    correct?

10                    MR. HOLLAND:  I believe it does.

11                    MR. QUAT:  All right.  Do you

12    understand that?

13                    THE WITNESS:  Fine.

14                    MR. QUAT:  Okay.

15                      (Pause)

16        A.    I don't see anything about me asking

17    for information to validate the debt.

18        Q.    That's actually my second question,

19    which is whether it's incomplete, but my first

20    question is is there anything that's inaccurate

21    there.

22        A.    Okay.

23                      (Pause)

24        A.    Different from how I remember.

Kenneth Kemp

98

1    Q.    What part of it is different from your
2    memory?

3    A.    I don't see anything about wanting the
4    debt validated, and I'd want to talk settlement
5    after the debt was validated.

6    Q.    So in any of your calls with Attorney
7    McCaughey, did you discuss settlement at all?

8    A.    Settlement was going to be discussed
9    after the debt was validated.

10   Q.    So did you have any discussions with
11   him in which you offered a specific amount of
12   money or he asked for a specific amount of
13   money?

14   A.    The way I look at it, I can't remember
15   if the 97 is 100 percent accurate, that what I
16   thought the debt was was a lot less than the
17   18,000 they were looking for, and that's what I
18   was stating that I owed.  And he told me, you
19   know, with interest and everything else, it was
20   higher.

21   Q.    What did you think that the debt was
22   at that time?

23   A.    I thought it was maybe 9,000 or
24   something.

Kenneth Kemp

99

1    Q.    And when you came up with that figure,

2    were you including interest?

3    A.    No.

4    Q.    You understood that credit card

5    holders charge you for unpaid interest, correct?

6         MR. QUAT:  Objection.

7    BY MR. HOLLAND:

8    Q.    Actually, I'll withdraw it and

9    rephrase it.

10        You understood that credit card

11   holders charge you interest on unpaid accounts?

12   A.    No.

13   Q.    You didn't have that understanding?

14   A.    It didn't happen with the other ones.

15   Q.    The ones that were charged off and

16   then after the fact you paid them back?

17   A.    Correct.

18   Q.    The ones that were charged off and you

19   paid them back, did you make a lump sum payment,

20   or did you pay them off over time?

21   A.    Lump sum.

22   Q.    In any of your conversations with

23   Ganick, O'Brien & Sarin, did Mr. McCaughey or

24   Mr. Book tell you that the client would accept a

Kenneth Kemp

119

1  attorney to discuss it.

2      Q.    Other than to meet with your attorney,

3  did you miss any work?

4      A.    I don't believe so.

5              MR. HOLLAND:  Can you mark that as

6  the next exhibit, please.

7              (Exhibit 2 marked

8              for identification)

9  BY MR. HOLLAND:

10      Q.    Sir, I show you what's been marked as

11  Deposition Exhibit 2 and ask you to look at that

12  and tell me if you recognize that document?

13      A.    Yes.

14      Q.    What is that document?

15      A.    It's an MLS listing sheet.

16      Q.    For what property?

17      A.    9 Elizabeth Road.

18      Q.    And this relates to the sale of the

19  property in 2004?

20      A.    Correct.

21      Q.    And in the top right, do you see the

22  information related to the sale price and the

23  sale date?

24      A.    Yep.

Kenneth Kemp

120

1      Q.    Is that information accurate?

2      A.    I believe so.

3      Q.    And this sale was an arm's length

4    transaction, correct?

5      A.    Correct.

6      Q.    And you acted as the listing broker?

7      A.    Correct.

8      Q.    Was there a selling broker on the

9    transaction?

10     A.    Yes.

11     Q.    Who was that?

12     A.    Bill Egan.

13          MR. HOLLAND:  Can you mark this as

14    the next exhibit, please.

15          (Exhibit 3 marked

16          for identification)

17    BY MR. HOLLAND:

18     Q.    Mr. Kemp, I'm going to show you what's

19    been marked as Deposition Exhibit 3.

20     A.    Okay.

21     Q.    I ask you to look at that and tell me

22    if you've ever seen it before?

23     A.    Yep.

24     Q.    What is it?

Kenneth Kemp

139

1    BY MR. HOLLAND:

2        Q.    You transferred the ownership interest

3    in Elizabeth Road to your wife some time in

4    September or October of 2003, correct?

5        A.    Correct.

6        Q.    At that time did you have any assets

7    other than the assets that you described for me

8    as being owned in July of 2004?

9        A.    The house until before the transfer.

10       Q.    But the next day you didn't have the

11   house anymore, correct?

12       A.    Correct.

13       Q.    Any other assets that you had at that

14   time being the time you transferred the house to

15   your wife, other than what you described for me?

16       A.    No.

17       Q.    And did you have more -- with respect

18   to the bank accounts, do you believe that you

19   had more money in any of those bank accounts in

20   September of 2003 than you did in -- strike

21   that -- September or October of 2003 than you

22   did in July of 2004?

23       A.    Could you repeat the question?

24       Q.    Sure.   In September or October of 2003

**EXHIBIT G**

*Kemp*

**EXHIBIT NO. 2**

7-7-06

9 Elizabeth Road
Billerica, MA  01821
Single Family

| | |
|---|---|
| MLS #: **70068552** | Status: **Sold** |
| List Price: **$324,900** | Sale Price: **$323,500** |
| List Date: **7/26/2004** | Sale Date: **9/26/2004** |
| Days on Market: **14** | Off Market Date: **8/9/2004** |
| County: **Middlesex County** | Area: |

## Property Features

| | |
|---|---|
| Rooms: **7** | Style: **Ranch** |
| Bedrooms: **3** | Type: **Single Family** |
| Full Bath: **1** | Acres: **0.23** |
| Half Bath: **0** | Lot Size: **10019** |
| Master Bath: **No** | Gross Living Area: **1508 sqft** |
| Fireplaces: **0** | Foundation Size: **unk (Poured Concrete)** |
| Year Built: **1954** | Garage: **0** -- |
| Color: | Parking: **4** -- |

## Room Descriptions

| Room | Level | Size | Features |
|---|---|---|---|
| Living Room: | 1 | | -- |
| Dining Room: | 1 | | -- |
| Kitchen: | 1 | | -- |
| Master Bedroom: | 1 | | -- |
| Bedroom 2: | 1 | | -- |
| Bedroom 3: | 1 | | -- |
| Bath 1: | 1 | | -- |
| Laundry: | 1 | | -- |
| Den: | 1 | | -- |

### Features

Waterfront: **No** --
Basement: **No   Slab**
Exterior: **Vinyl**
Heating: **Hot Water Baseboard**
Cooling: **None**
Hot Water: **Natural Gas**
Electricity: --
Appliances: **Range**
Interior Features: --
Exterior Features: **Patio, Fenced Yard**
Construction: **Frame**
Roof: **Asphalt/Fiberglass Shingles**
Road Type: **Public**
Amenities: **Shopping, Golf Course**
Sewer and Water: **City/Town Water, City/Town Sewer**

## Remarks

**Seven room ranch with oversized family room with wood stove,newer roof,windows,and hot water heater. Seller will give credit toward carpets. Broker is related to the seller. No showing until 7/29/04**

## Tax Information

Pin #: **Map 89 Block 107**
Assessment: **$245,900**
Taxes: **$2685.23** Tax Year: **2004**
Book: **156** Page: **233**
Cert:
Zoning: **3**
Map: **89** Block: **107** Lot:

## Listing Information

| | |
|---|---|
| Directions: **Wyman to Elizabeth** | Original Price: **$324,900** |
| Showing: Sub-Agent: **Call List Agent** | Sub-Agent: **2.0** |
| Buyer-Agent: **Call List Agent** | Buyer Agent: **2.0** |
| Special Instructions: | Other: |
| Exclusions: | Listing Agreement Type: **Exclusive Right to Sell** |
| Disclosures: | Entry Only: **No** |
| Firm Remarks: **Call Ken to set up appt 978 852 2963** | |
| Listing Office: **Kenneth Kemp** ▯  **(978) 349-6020** | Listing Agent: **Kennith Kemp  (978) 663-9964** |
| Sale Office: **Century 21 Travis R. E.** ▯  **(978) 667-2121** | Sale Agent: **William F. Egan, Jr.  (978) 667-1407** |

The information in this listing was gathered from third party sources including the seller and public records. MLS Property Information Network and its subscribers disclaim any and all representations or warranties as to the accuracy of this information. Content ©2004 MLS Property Information Network, Inc.

*Kemp*

**EXHIBIT NO. 5**

*7-7-06*

WHEN RECORDED MAIL TO:
COUNTRYWIDE HOME LOANS, INC.
MSN SV-79 / DOCUMENT CONTROL DEPT.
P.O. BOX 10266
VAN NUYS, CALIFORNIA 91410-0266

DOC ID #: 0003923053265209

ESCROW/CLOSING #:

SPACE ABOVE FOR RECORDERS USE

PARCEL ID #: 1
Prepared by: B. STOREY

# MORTGAGE
(Line of Credit)

THIS MORTGAGE, dated October 6 ,2003 , is between
CHRISTINE M KEMP & Kenneth J. Kemp

residing at
9 ELIZABETH ROAD, BILLERICA, MA 01821-
the person or persons signing as "Mortgagor(s)" below and hereinafter referred to as "we" or "us" and
COUNTRYWIDE HOME LOANS, INC.
with an address at
4500 Park Granada, Calabasas, CA 91302-1613
and hereinafter referred to as "you" or the "Mortgagee."

MORTGAGED PREMISES: In consideration of the loan hereinafter described, we hereby mortgage, grant and convey to you, with mortgage covenants and with power of sale, the premises located at:
9 ELIZABETH ROAD

| BILLERICA | MIDDLESEX | MA | 01821- | (the "Premises"). |
|-----------|-----------|-----|--------|-------------------|
| Municipality | Street County | State | ZIP | |

and further described as:

The Premises includes all buildings and other improvements now or in the future on the Premises and all rights and interests which derive from our ownership, use or possession of the Premises and all appurtenances thereto.

LOAN: The Mortgage will secure your loan in the principal amount of $ 55,000.00                    or so much thereof as may be
advanced and readvanced from time to time to CHRISTINE M KEMP
                                                                                                                      , and
                                                            , the Borrower(s) under the Home Equity Credit Line Agreement
And Disclosure Statement (the "Note") dated October 6, 2003                    , plus interest and costs, late charges and all other
charges related to the loan, all of which sums are repayable according to the Note. This Mortgage will also secure the performance
of all of the promises and agreements made by us and each Borrower and Co-Signer in the Note, all of our promises and
agreements in this Mortgage, any extensions, renewals, amendments, supplements and other modifications of the Note, and any
amounts advanced by you under the terms of the section of this Mortgage entitled "Our Authority To You." The Note documents
an open-end credit plan as defined in General Laws chapter 140D section 1, pursuant to which loans may be made, repaid and
remade from time to time.



DOC ID # 0003923053265209

OWNERSHIP: We are the sole owner(s) of the Premises. We have the legal right to mortgage the Premises to you.

BORROWER'S IMPORTANT OBLIGATIONS:

(a) TAXES: We will pay all real estate taxes, assessments, water charges and sewer rents relating to the Premises when they become due. We will not claim any credit on, or make deduction from, the loan under the Note because we pay these taxes and charges. We will provide you with proof of payment upon request.

(b) MAINTENANCE: We will maintain the building(s) on the Premises in good condition. We will not make major changes in the building(s) except for normal repairs. We will not tear down any of the building(s) on the Premises without first getting your consent. We will not use the Premises illegally. If this Mortgage is on a unit in a condominium or a planned unit development, we shall perform all of our obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development and constituent documents.

(c) INSURANCE: We will keep the building(s) on the Premises insured at all times against loss by fire, flood and any other hazards you may specify. We may choose the insurance company, but our choice is subject to your reasonable approval. The policies must be for at least the amounts and the time periods that you specify. We will deliver to you upon your request the policies or other proof of the insurance. The policies must name you as "mortgagee" and "loss-payee" so that you will receive payment on all insurance claims, to the extent of your interest under this Mortgage, before we do. The insurance policies must also provide that you be given not less than 10 days prior written notice of any cancellation or reduction in coverage, for any reason. Upon request, we shall deliver the policies, certificates or other evidence of insurance to you. In the event of loss or damage to the Premises, we will immediately notify you in writing and file a proof of loss with the insurer. You may file a proof of loss on our behalf if we fail or refuse to do so. You may also sign our name to any check, draft or other order for the payment of insurance proceeds in the event of loss or damage to the Premises. If you receive payment of a claim, you will have the right to choose to use the money either to repair the Premises or to reduce the amount owing on the Note.

(d) CONDEMNATION: We assign to you the proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Premises, or part thereof, or for conveyance in lieu of condemnation, all of which shall be paid to you, subject to the terms of any Prior Mortgage.

(e) SECURITY INTEREST: We will join with you in signing and filing documents and, at our expense, in doing whatever you believe is necessary to perfect and continue the perfection of your lien and security interest in the Premises.

(f) OUR AUTHORITY TO YOU: If we fail to perform our obligations under this Mortgage, you may, if you choose, perform our obligations and pay such costs and expenses. You will add the amounts you advance to the sums owing on the Note, on which you will charge interest at the interest rate set forth in the Note. If, for example, we fail to honor our promises to maintain insurance in effect, or to pay filing fees, taxes or the costs necessary to keep the Premises in good condition and repair or to perform any of our other agreements with you, you may, if you choose, advance any sums to satisfy any of our agreements with you and charge us interest on such advances at the interest rate set forth in the Note. This Mortgage secures all such advances. Your payments on our behalf will not cure our failure to perform our promises in this Mortgage. Any replacement insurance that you obtain to cover loss or damages to the Premises may be limited to the amount owing on the Note plus the amount of any Prior Mortgages.

(g) PRIOR MORTGAGE: If the provisions of this paragraph are completed, this Mortgage is subject and subordinate to a prior mortgage dated September 25, 2003 and given by us to COUNTRYWIDE HOME LOANS as mortgagee, in the original amount of $ 200,000.00 (the "Prior Mortgage"). We shall not increase, amend or modify the Prior Mortgage without your prior written consent and shall upon receipt of any written notice from the holder of the Prior Mortgage promptly deliver a copy of such notice to you. We shall pay and perform all of our obligations under the Prior Mortgage as and when required under the Prior Mortgage.

(h) HAZARDOUS SUBSTANCES: We shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Premises. We shall not do, nor allow anyone else to do, anything affecting the Premises that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Premises of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Premises. As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Premises are located that relate to health, safety or environmental protection.

(i) SALE OF PREMISES: We will not sell, transfer ownership of, mortgage or otherwise dispose of our interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises without your prior written consent.

(j) INSPECTION: We will permit you to inspect the Premises at any reasonable time.





DOC ID # 0003920532065209

NO LOSS OF RIGHTS: The Note and this Mortgage may be negotiated or assigned by you without releasing us or the Premises. You may add or release any person or property obligated under the Note and this Mortgage without losing your rights in the Premises.

DEFAULT: Except as may be prohibited by applicable law, and subject to any advance notice and cure period if required by applicable law, if any event or condition described in Paragraph 12.A. of the Note occurs, you may foreclose upon this Mortgage. This means that you may invoke the Statutory Power of Sale and may arrange for the Premises to be sold, as provided by law, in order to pay off what we owe on the Note and under this Mortgage. If the money you receive from the sale is not enough to pay off what we owe you, we will still owe you the difference which you may seek to collect from us in accordance with applicable law. In addition, you may, in accordance with applicable law, (i) enter on and take possession of the Premises; (ii) collect the rental payments, including over-due rental payments, directly from tenants; (iii) manage the Premises; and (iv) sign, cancel and change leases. We agree that the interest rate set forth in the Note will continue before and after a default, entry of a judgment and foreclosure. In addition, you shall be entitled to collect all reasonable fees and costs actually incurred by you in proceeding to foreclosure, including, but not limited to, reasonable attorneys fees and costs of documentary evidence, abstracts and title reports.

ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER: As additional security, we assign to you the rents of the Premises. You or a receiver appointed by the courts shall be entitled to enter upon, take possession of and manage the Premises and collect the rents of the Premises including those past due.

WAIVERS: To the extent permitted by applicable law, we waive and release any error or defects in proceedings to enforce this Mortgage and hereby waive the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale and homestead exemption.

BINDING EFFECT: Each of us shall be fully responsible for all of the promises and agreements in this Mortgage. Until the Note has been paid in full and your obligation to make further advances under the Note has been terminated, the provisions of this Mortgage will be binding on us, our legal representatives, our heirs and all future owners of the Premises. This Mortgage is for your benefit and for the benefit of anyone to whom you may assign it. Upon payment in full of all amounts owing to you under the Note and this Mortgage, and provided any obligation to make further advances under the Note has terminated, this Mortgage and your rights in the Premises shall end.

NOTICE: Except for any notice required under applicable law to be given in another manner, (a) any notice to us provided for in this Mortgage shall be given by delivering it or by mailing such notice by regular first class mail addressed to us at the last address appearing in your records or at such other address as we may designate by notice to you as provided herein, and (b) any notice to you shall be given by certified mail, return receipt requested, to your address at
COUNTRYWIDE HOME LOANS, INC.
4500 Park Granada, Calabasas, CA 91302-1613
or to such other address as you may designate by notice to us. Any notice provided for in this Mortgage shall be deemed to have been given to us or you when given in the manner designated herein.

RELEASE: Upon payment of all sums secured by this Mortgage and provided your obligation to make further advances under the Note has terminated, you shall discharge this Mortgage without charge to us, except that we shall pay any fees for recording of a satisfaction of this Mortgage.

PAID IN FULL

DOC. ID # 0003923053265209

GENERAL: You can waive or delay enforcing any of your rights under this Mortgage without losing them. Any waiver by you of any provisions of this Mortgage will not be a waiver of that or any other provision on any other occasion.

THIS MORTGAGE has been signed by each of us under seal on the date first above written.

WITNESS:

_____ /A To Both

As Attorney in Fact For Christine M. Kemp _____ (SEAL)

Mortgagor: CHRISTINE M KEMP

_____ (SEAL)

Mortgagor: Kenneth J. Kemp

_____ (SEAL)

Mortgagor:

_____ (SEAL)

Mortgagor:

COMMONWEALTH OF MASSACHUSETTS,                      Middlesex    County ss:

On this    OCT 0 6 2003    day of _____, before me personally appeared

Christine M. & Kenneth J. Kemp

to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires: 12/4/09

Notary Public

CHRISTOPHER T. PERRY
My Commission Expires December 4, 2009

PAID IN FULL

*Kemp*

**EXHIBIT NO.** 6

7-7-06

WHEN RECORDED MAIL TO:
COUNTRYWIDE HOME LOANS, INC.
MSN SV-79 / DOCUMENT CONTROL DEPT.
P.O. BOX 10266
VAN NUYS, CALIFORNIA 91410-0266

SPACE ABOVE FOR RECORDERS USE

DOC ID #: 0003923008465106

ESCROW/CLOSING #:

PARCEL ID #: MAP 89/107
Prepared by: S. ZEROM

## MORTGAGE
(Line of Credit)

THIS MORTGAGE, dated September 25 ,2003 , is between
CHRISTINE M KEMP *and KENNETH JOHN KEMP*

residing at
9 ELIZABETH ROAD, BILLERICA, MA 01821-
the person or persons signing as "Mortgagor(s)" below and hereinafter referred to as "we" or "us" and
COUNTRYWIDE HOME LOANS, INC.
with an address at
4500 Park Granada, Calabasas, CA 91302-1613
and hereinafter referred to as "you" or the "Mortgagee."

MORTGAGED PREMISES: In consideration of the loan hereinafter described, we hereby mortgage, grant and convey to you, with mortgage covenants and with power of sale, the premises located at:
9 ELIZABETH ROAD

| BILLERICA | MIDDLESEX | MA | 01821- | (the "Premises"). |
|-----------|-----------|----|--------| |
| Municipality | County | State | ZIP | |

Street

and further described as:
SEE EXHIBIT 'A' ATTACHED HERETO AND MADE A PART HEREOF.

*PAID IN FULL*

The Premises includes all buildings and other improvements now or in the future on the Premises and all rights and interests which derive from our ownership, use or possession of the Premises and all appurtenances thereto.

LOAN: The Mortgage will secure your loan in the principal amount of $ 200,000.00                      or so much thereof as may be advanced and readvanced from time to time to CHRISTINE M KEMP

And Disclosure Statement (the "Note") dated September 25, 2003                      , the Borrower(s) under the Home Equity Credit Line Agreement , and charges related to the loan, all of which sums are repayable according to the Note. This Mortgage will also secure the performance of all of the promises and agreements made by us and each Borrower and Co-Signer in the Note, all of our promises and agreements in this Mortgage, any extensions, renewals, amendments, supplements and other modifications of the Note, and any amounts advanced by you under the terms of the section of this Mortgage entitled "Our Authority To You." The Note documents an open-end credit plan as defined in General Laws chapter 140D section I, pursuant to which loans may be made, repaid and remade from time to time.

HELOC - MA MORTGAGE
2C4781MA (03/01)



OWNERSHIP: We are the sole owner(s) of the Premises. We have the legal right to mortgage the Premises to you.

DOC ID # 0003923008465106

BORROWER'S IMPORTANT OBLIGATIONS:

(a) TAXES: We will pay all real estate taxes, assessments, water charges and sewer rents relating to the Premises when they become due. We will not claim any credit on, or make deduction from, the loan under the Note because we pay these taxes and charges. We will provide you with proof of payment upon request.

(b) MAINTENANCE: We will maintain the building(s) on the Premises in good condition. We will not make major changes in the building(s) except for normal repairs. We will not tear down any of the building(s) on the Premises without first getting your consent. We will not use the Premises illegally. If this Mortgage is on a unit in a condominium or a planned unit development, we shall perform all of our obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development and constituent documents.

(c) INSURANCE: We will keep the building(s) on the Premises insured at all times against loss by fire, flood and any other hazards you may specify. We may choose the insurance company, but our choice is subject to your reasonable approval. The policies must be for at least the amounts and the time periods that you specify. We will deliver to you upon your request the policies or other proof of the insurance. The policies must name you as "mortgagee" and "loss-payee" so that you will receive payment on all insurance claims, to the extent of your interest under this Mortgage, before we do. The insurance policies must also provide that you be given not less than 10 days prior written notice of any cancellation or reduction in coverage, for any reason. Upon request, we shall deliver the policies, certificates or other evidence of insurance to you. In the event of loss or damage to the Premises, we will immediately notify you in writing and file a proof of loss with the insurer. You may file a proof of loss on our behalf if we fail or refuse to do so. You may also sign our name to any check, draft or other order for the payment of insurance proceeds in the event of loss or damage to the Premises. If you receive payment of a claim, you will have the right to choose to use the money either to repair the Premises or to reduce the amount owing on the Note.

(d) CONDEMNATION: We assign to you the proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Premises, or part thereof, or for conveyance in lieu of condemnation, all of which shall be paid to you, subject to the terms of any Prior Mortgage.

(e) SECURITY INTEREST: We will join with you in signing and filing documents and, at our expense, in doing whatever you believe is necessary to perfect and continue the perfection of your lien and security interest in the Premises.

(f) OUR AUTHORITY TO YOU: If we fail to perform our obligations under this Mortgage, you may, if you choose, perform our obligations and pay such costs and expenses. You will add the amounts you advance to the sums owing on the Note, on which you will charge interest at the interest rate set forth in the Note. If, for example, we fail to honor our promises to maintain insurance in effect, or to pay filing fees, taxes or the costs necessary to keep the Premises in good condition and repair or to perform any of our other agreements with you, you may, if you choose, advance any sums to satisfy any of our agreements with you and charge us interest on such advances at the interest rate set forth in the Note. This Mortgage secures all such advances. Your payments on our behalf will not cure our failure to perform our promises in this Mortgage. Any replacement insurance that you obtain to cover loss or damage to the Premises may be limited to the amount owing on the Note plus the amount of any Prior Mortgages.

(g) PRIOR MORTGAGE: If the provisions of this paragraph are completed, this Mortgage is subject and subordinate to a prior mortgage dated May 1, 2000                            and given by us to
OWNS FREE & CLEAR
as mortgagee, in the original amount of $ 1.00                            (the "Prior Mortgage"). We shall not increase, amend or modify the Prior Mortgage without your prior written consent and shall upon receipt of any written notice from the holder of the Prior Mortgage promptly deliver a copy of such notice to you. We shall pay and perform all of our obligations under the Prior Mortgage as and when required under the Prior Mortgage.

(h) HAZARDOUS SUBSTANCES: We shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Premises. We shall not do, nor allow anyone else to do, anything affecting the Premises that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Premises of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Premises. As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Premises are located that relate to health, safety or environmental protection.

(i) SALE OF PREMISES: We will not sell, transfer ownership of, mortgage or otherwise dispose of our interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises without your prior written consent.

(j) INSPECTION: We will permit you to inspect the Premises at any reasonable time.

Initials  KL PP



**NO LOSS OF RIGHTS:** The Note and this Mortgage may be negotiated or assigned by you without releasing us or the Premises. You may add or release any person or property obligated under the Note and this Mortgage without losing your rights in the Premises.

DOC ID # 000392300846516106

**DEFAULT:** Except as may be prohibited by applicable law, and subject to any advance notice and cure period if required by applicable law, if any event or condition described in Paragraph 12.A. of the Note occurs, you may foreclose upon this Mortgage. This means that you may invoke the Statutory Power of Sale and may arrange for the Premises to be sold, as provided by law, in order to pay off what we owe on the Note and under this Mortgage. If the money you receive from the sale is not enough to pay off what we owe you, we will still owe you the difference which you may seek to collect from us in accordance with applicable law. In addition, you may, in accordance with applicable law, (i) enter on and take possession of the Premises; (ii) collect the rental payments, including over-due rental payments, directly from tenants; (iii) manage the Premises; and (iv) sign, cancel and change leases. We agree that the interest rate set forth in the Note will continue before and after a default, entry of a judgment and foreclosure. In addition, you shall be entitled to collect all reasonable fees and costs actually incurred by you in proceeding to foreclosure, including, but not limited to, reasonable attorneys fees and costs of documentary evidence, abstracts and title reports.

**ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER:** As additional security, we assign to you the rents of the Premises. You or a receiver appointed by the courts shall be entitled to enter upon, take possession of and manage the Premises and collect the rents of the Premises including those past due.

**WAIVERS:** To the extent permitted by applicable law, we waive and release any error or defects in proceedings to enforce this Mortgage and hereby waive the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale and homestead exemption.

**BINDING EFFECT:** Each of us shall be fully responsible for all of the promises and agreements in this Mortgage. Until the Note has been paid in full and your obligation to make further advances under the Note has been terminated, the provisions of this Mortgage will be binding on us, our legal representatives, our heirs and all future owners of the Premises. This Mortgage is for your benefit and for the benefit of anyone to whom you may assign it. Upon payment in full of all amounts owing to you under the Note and this Mortgage, and provided any obligation to make further advances under the Note has terminated, this Mortgage and your rights in the Premises shall end.

**NOTICE:** Except for any notice required under applicable law to be given in another manner, (a) any notice to us provided for in this Mortgage shall be given by delivering it or by mailing such notice by regular first class mail/addressed to us at the last address appearing in your records or at such other address as we may designate by notice to you as provided herein, and (b) any notice to you shall be given by certified mail, return receipt requested, to your address at

COUNTRYWIDE HOME LOANS, INC.
4500 Park Granada, Calabasas, CA 91302-1613

or to such other address as you may designate by notice to us. Any notice provided for in this Mortgage shall be deemed to have been given to us or you when given in the manner designated herein.

**RELEASE:** Upon payment of all sums secured by this Mortgage and provided your obligation to make further advances under the Note has terminated, you shall discharge this Mortgage without charge to us, except that we shall pay any fees for recording of a satisfaction of this Mortgage.



GENERAL: You can waive or delay enforcing any of your rights under this Mortgage without losing them. Any waiver by you of any provisions of this Mortgage will not be a waiver of that or any other provision on any other occasion.

DOC ID # 0003923008465106

THIS MORTGAGE has been signed by each of us under seal on the date first above written.

WITNESS:

_As To Both_

_As Attorney In Fact for Christine M. Kemp_
Mortgagor: CHRISTINE M KEMP _____ (SEAL)

Mortgagor: KENNETH JOHN KEMP _____ (SEAL)

Mortgagor: _____ (SEAL)

Mortgagor: _____ (SEAL)

COMMONWEALTH OF MASSACHUSETTS,

On this _25th_ day of _September_ , _2003_ , before me personally appeared _Middlesex_ County ss:

to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires: _12/1/09_

Notary Public

PAID IN FULL

HELOC - MA MORTGAGE
2C4784MA (03/01)
Page 4 of 4

**EXHIBIT H**

Christine Kemp

1                                              Volume:  I

2                                              Pages:   1 - 23

3            UNITED STATES DISTRICT COURT

4            DISTRICT OF MASSACHUSETTS

5                          C.A. No. 05-11516-GAO

6

7    KENNETH KEMP, on behalf of himself and all others

8    similarly situated, and CHRISTINE KEMP,

9            Plaintiffs,

10       v.

11   GANICK, O'BRIEN & SARIN, ATTORNEYS AT LAW, LAWRENCE

12   E. O'BRIEN, JR., d/b/a GANICK, O'BRIEN & SARIN,

13   ATTORNEYS AT LAW, and DOES 1 - 5,

14           Defendants.

15

16                    **********

17           DEPOSITION OF CHRISTINE KEMP

18            Tuesday, August 29, 2006

19          Lynch, Brewer, Hoffman & Fink

20              101 Federal Street

21             Boston, Massachusetts

22                 2:00 p.m.

23          Reporter:  Linda M. Grieco

24

Christine Kemp

8

1    A.   Well, I have good credit.

2    Q.   And he does not?

3    A.   No.

4    Q.   Or at least he did not?

5    A.   Now -- yes, at the time he did not have good

6    credit, and I did.

7    Q.   Do you know why he did not have good credit?

8    A.   Yes.

9    Q.   Why?

10    A.   Because he had some outstanding debt.

11    Q.   Do you know what that was?

12    A.   I don't really.

13    Q.   Okay.  At the time -- in February of 2003,

14    did you own any other real estate?

15    A.   The house we lived in 9 Elizabeth Road and

16    that house in Quincy.

17    Q.   At the time that your husband transferred

18    his interest in 8 Richfield Street to you, were

19    there any mortgages on the property?

20    A.   At 8 Richfield Street?

21    Q.   Yes.

22    A.   I don't know.

23    Q.   When did you first acquire an interest in

24    9 Elizabeth Road?

Christine Kemp

9

1    A.  To purchase it?

2    Q.  When did you first purchase it, yes.

3    A.  When we got married in April of '93.

4    Q.  And at the time that you purchased 9

5  Elizabeth Road, did you and your husband purchase it

6  jointly?

7    A.  Yes.

8    Q.  And at some point in time did your husband

9  transfer his interest in that property to you?

10    A.  Yes.

11    Q.  When was that?

12    A.  Let me clarify.  Does interest mean he --

13    Q.  At some point in time, the owners of that

14  property were you and your husband jointly, correct?

15    A.  Right, yes.

16    Q.  At some point in time did you and your

17  husband transfer ownership of that property to you

18  individually?

19    A.  Of 9 Elizabeth Road?

20    Q.  9 Elizabeth Road, correct.

21    A.  Yes.

22    Q.  And the same thing happened with 8 Richfield

23  Street, correct?

24    A.  Yes.

**EXHIBIT I**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KENNETH KEMP, | ) | |
| On behalf of himself and all others | ) | |
| similarly situated, and | ) | |
| CHRISTINE KEMP, | ) | |
|       Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil No. 05-11516-GAO |
| | ) | |
| GANICK, O'BRIEN & SARIN, Attorneys at Law, | ) | |
| LAWRENCE E. O'BRIEN, JR., d/b/a | ) | |
| GANICK, O'BRIEN & SARIN, Attorneys at Law, | ) | |
| And DOES 1-5, | ) | |
|       Defendants | ) | |

## KENNETH KEMP'S ANSWERS TO FIRST SET OF INTERROGATORIES

Plaintiff Kenneth Kemp hereby answers the first set of interrogatories propounded by defendant Ganick, O'Brien & Sarin.

### General Objections and Qualifications

1. Plaintiff objects to the "Introduction and Definitions" set forth in defendant's interrogatories insofar as they seek to impose any obligations or requirements greater than or inconsistent with the Federal Rules of Civil Procedure.

2. These answers are given solely for purposes of this action.

3. These answers are made without waiving, and expressly reserving, the right to object to any attempt by defendant to use the answers or any parts thereof at trial or other proceeding.

4. This case remains in the discovery phase, and as such plaintiff has not yet

Answer: See Answers 19 and 20, above.

22Q    Please describe in detail the facts upon which you rely in making the allegations contained in Paragraph 50 of the Complaint.

Answer: I will not be proceeding on a class basis with respect to Count VII, therefore no answer required.

23Q    Please describe in detail the facts upon which you rely in making the allegations in the Complaint that, as a result of Defendants' conduct, Plaintiffs suffered severe emotional distress and mental anguish, and monetary loss.

Answer: Defendant's unfounded accusation that I had transferred property fraudulently, and its attempt to hold my wife responsible for a debt that was not hers, caused my wife and I to feel upset, frustrated, angry, and victimized. In retrospect, I do not believe there was monetary loss, and I will amend the complaint accordingly.

24Q    Please itemize all damage that the Plaintiffs allege that they have suffered as a result of the actions described in the Complaint, including in your answer a description of which damages relate to each count of the Complaint.

Answer: Plaintiff objects to defendant's use of the term "itemize" in this interrogatory on the ground that it is vague and undefined. Notwithstanding said objection, but not waiving same, plaintiff states: Counts I and II – primarily confusion and discouragement; Counts III – VI: emotional distress and mental anguish (see Answer 23, above); Count VII – primarily confusion and discouragement; Count VIII – concern, anxiety, coercion, and confusion.

25Q    Please identify all witness [sic] you intend to call in trial of this case.

Answer: As of present, I have not identified trial witnesses other than the two plaintiffs and Attorney David Book.

26Q    If the Plaintiff or his attorneys intend to call an expert witness at the trial of this matter, please:

    a.    identify each and every such expert;

    b.                                                  identify each and every such expert's qualifications;

    c.    state the subject matter on which each such person is expected to testify;

    d.    state the substance of the facts and opinions to which each such person is expected to testify; and

**EXHIBIT J**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KENNETH KEMP, <br> On behalf of himself and all others <br> similarly situated, and <br> CHRISTINE KEMP, <br>         Plaintiffs <br><br> v. <br><br> GANICK, O'BRIEN & SARIN, Attorneys at Law, <br> LAWRENCE E. O'BRIEN, JR., d/b/a <br> GANICK, O'BRIEN & SARIN, Attorneys at Law, <br> And DOES 1-5, <br>         Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil No. 05-11516-GAO |

## CHRISTINE KEMP'S ANSWERS TO FIRST SET OF INTERROGATORIES

Plaintiff Christine Kemp hereby answers the first set of interrogatories propounded by defendant Ganick, O'Brien & Sarin.

### General Objections and Qualifications

1. Plaintiff objects to the "Introduction and Definitions" set forth in defendant's interrogatories insofar as they seek to impose any obligations or requirements greater than or inconsistent with the Federal Rules of Civil Procedure.

2. These answers are given solely for purposes of this action.

3. These answers are made without waiving, and expressly reserving, the right to object to any attempt by defendant to use the answers or any parts thereof at trial or other proceeding.

4. This case remains in the discovery phase, and as such plaintiff has not yet

plaintiff states: See Answer 14, above.

18Q    Please describe in detail the facts upon which you rely in making the allegations contained in Paragraph 34 of the Complaint.

Answer:  Defendant asserted a fraudulent transfer claim against Kenneth Kemp and a claim against me even though it knew, or should have known, that it had insufficient facts on which to base said claims.

19Q    Please describe in detail the facts upon which you rely in making the allegations contained in Paragraph 41 of the Complaint.

Answer:  Plaintiff objects to answering this interrogatory on the ground that the allegations in question were not made by her.

20Q    Please describe in detail the facts upon which you rely in making the allegations contained in Paragraph 43 of the Complaint.

Answer:  Plaintiff objects to answering this interrogatory on the ground that the allegations in question were not made by her.

21 Q    Please describe in detail the facts upon which you rely in making the allegations
contained in Paragraph 44 of the Complaint.

Answer: Plaintiff objects to answering this interrogatory on the ground that the allegations in question were not made by her.

22Q    Please describe in detail the facts upon which you rely in making the allegations contained in Paragraph 50 of the Complaint.

Answer:  Plaintiff objects to answering this interrogatory on the ground that the allegations in question were not made by her.

23Q    Please describe in detail the facts upon which you rely in making the allegations in the Complaint that, as a result of Defendants' conduct, Plaintiffs suffered severe emotional distress and mental anguish, and monetary loss.

Answer:  Defendant's unfounded accusation that Kenneth Kemp had transferred property fraudulently, and its attempt to hold me personally responsible for a debt that was not mine, caused my husband and I to feel upset, frustrated, angry, and victimized. In retrospect, I do not believe there was monetary loss, and I will amend the complaint accordingly.

24Q    Please itemize all damage that the Plaintiffs allege that they have suffered as a result of the actions described in the Complaint, including in your answer a description of which damages relate to each count of the Complaint.