# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| KENNETH KEMP, ) | |
| On behalf of himself and all others ) | |
| similarly situated,  and ) | |
| CHRISTINE KEMP, ) | |
|         Plaintiffs ) | |
| ) | |
| v. ) | Civil No. 05-11516-GAO |
| ) | |
| GANICK, O'BRIEN & SARIN, Attorneys at Law, ) | |
| LAWRENCE E. O'BRIEN, JR., d/b/a ) | |
| GANICK, O'BRIEN & SARIN, Attorneys at Law, ) | |
| And DOES 1-5, ) | |
|         Defendants ) | |

_____

## AFFIDAVIT OF KENNETH D. QUAT, ESQUIRE, IN OPPOSITION TO DEFENDANTS' MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT

I, Kenneth D. Quat, Esquire, hereby depose and state on oath:

1.  My name is Kenneth D. Quat.  I make this affidavit on personal knowledge.

2.   I have been duly licensed to practice law in the Commonwealth of Massachusetts since 1980.  I have been a member of the bar of this Court since 1981, and am currently a member in good standing of all bars to which I have been admitted.  I have been counsel of record for plaintiffs since the commencement of the instant action.

3.  Attached to this affidavit are documents identified as Exhibits A – E.  I hereby certify that these exhibits consist of true and correct copies of the following documents:

        Exhibit A:  Pages 30-31, Deposition of Kenneth Kemp

        Exhibit B:  Pages 75-76; 81-84; and 98, Deposition of Kenneth Kemp

        Exhibit C:  Page 15, Deposition of David A. Book.

Exhibit D:  Pages 40-47, Deposition of David A. Book

Exhibit E:   Pages 34-37, Deposition of David A. Book

Signed and sworn to under the pains and penalties of perjury.

/s/ Kenneth D. Quat

Kenneth Kemp

30

1          Q.   And how much was that mortgage for?

2          A.   I think it was either 185 or 187,5.

3     In the 180s, I believe.

4          Q.   And there was a promissory note that

5     went with that mortgage as well?

6          A.   Correct.

7          Q.   And who was on that promissory note;

8     that is, who promised to pay?

9          A.   Christine Kemp.

10          Q.   Solely?

11          A.   Correct.

12          Q.   So after transfer to your wife, you

13     had no ownership interest in that property?

14          A.   Correct.

15          Q.   And after the transfer to your wife,

16     you had no debt that was associated with that

17     real estate; is that correct?

18          A.   Meaning me?

19          Q.   Yes, you personally.

20          A.   Correct.

21          Q.   Why is it that you transferred

22     Ridgefield to your wife in February of 2003?

23          A.   At the time we did it, the plan was to

24     eventually buy another house.  And after looking

Kenneth Kemp

31

1    around at mortgages, I knew that was the best

2    option to do it.

3        Q.    I don't understand what you mean by

4    that.

5        A.    In terms of financing, that was going

6    to be the best opportunity in terms of rate and

7    everything else as going through my wife.

8        Q.    Meaning that if the property was in

9    your wife's name, she could get a better rate --

10        A.    Better rate and less liability for me.

11        Q.    Let me finish the question before you

12    answer it.

13        A.    Okay.

14        Q.    Meaning that if the property was in

15    your wife's name, she would get a lower interest

16    rate than if it was in your name?

17        A.    Correct.

18        Q.    Why is that?

19        A.    Her credit score was higher.

20        Q.    Now, you also said that it would mean

21    less liability for you?

22        A.    That was my assumption at the time.

23        Q.    What do you mean by that?

24        A.    I drive around a lot, things like

Kenneth Kemp

75

1        Q.   And do you recall when you called the

2    law office?

3        A.   I want to say it was November of '03.

4        Q.   Do you recall who you spoke with?

5        A.   I spoke to two attorneys the first

6    day.  I believe it was Book and McCaughey.  I'm

7    not sure if that's how it's pronounced.

8        Q.   Who did you speak with first?

9        A.   I think it was Attorney Book, and then

10   it got passed on to Attorney McCaughey.

11       Q.   Let me focus on your telephone

12   conversation with Attorney Book.

13            How long did it last?

14       A.   A few minutes.

15       Q.   As best you can recall, what did you

16   say to him, and what did he say to you?

17       A.   I was calling about the letter.  I was

18   disputing the debt.  And I asked if I needed to

19   put something in writing to get information on

20   the debt.

21       Q.   Do you recall anything else you said?

22       A.   I was disputing the dollar amount.

23       Q.   At the time that you called the law

24   firm, did you understand that the debt related

76

1    to the Chase debt?

2        A.    I'm not sure if I did before or if

3    they had told me.

4        Q.    Do you recall anything else that you

5    said to Attorney Book?

6        A.    I disputed the amount of the debt and

7    that I want evidence of the debt.  And if the

8    evidence was provided, I'd want to talk

9    settlement.

10       Q.    And what did he say to you?

11       A.    I'm not sure if it was passed on to

12   McCaughey at that point, but they told me with

13   the holidays and everything, it would take a

14   while to get something.

15       Q.    Okay.  Do you recall anything else

16   that Attorney Book said to you?

17       A.    Not exactly, no.

18       Q.    Did he say anything in response to

19   your statement that you were disputing the debt

20   and the dollar amount?

21       A.    Yes.

22       Q.    What did he say?

23       A.    He'd get that information.

24       Q.    And did he say anything in response to

Kenneth Kemp

81

1   a dollar amount that was currently owed to the
2   client, which I was confused the way it was
3   written.

4          And I mentioned then asking for the
5   dollar amount, and I said there was nothing in
6   the information that was printed off from Chase
7   showing that I had actually opened the debt.
8   And it was my concern of the actual age and
9   statute of limitations of this debt.

10        Q.   Prior to receiving this letter, which
11   is some form of Exhibit B to the complaint, had
12   you ever received a letter from a law firm
13   seeking to collect a debt?

14        A.   Yes.

15        Q.   On how many other occasions?

16        A.   Twice.

17        Q.   When were those occasions?

18        A.   I could get the exact dates, but I'm
19   not sure.

20        Q.   Just tell me approximately.

21        A.   A couple of years before this maybe.

22        Q.   And do you know what debt or debts
23   those collection letters related to?

24        A.   Discover card and the other Chase.

Kenneth Kemp

84

1      A.    Correct.

2      Q.    Do you recall anything else that you

3  said in this conversation in late December or

4  early January?

5      A.    Just that I wanted valid evidence of

6  the debt, and if I received it, that I would

7  pay.

8      Q.    Do you recall anything that Attorney

9  McCaughey said to you in this conversation?

10     A.    After I received the information?

11     Q.    The conversation that took place in

12 late December or early January.

13     A.    After I received the information?

14     Q.    This would have been your second

15 conversation with him.

16     A.    Right, right.

17         I told him it was unclear, that my

18 name is not on there, and the account number is

19 not on there.  All that's there is a piece of

20 paper from, you know, it looked like a Chase

21 handbook or something.

22         And I said that's not evidence I owe

23 the debt, and he basically said, well, that's

24 all you're getting.

Kenneth Kemp

98

1      Q.    What part of it is different from your

2   memory?

3      A.    I don't see anything about wanting the

4   debt validated, and I'd want to talk settlement

5   after the debt was validated.

6      Q.    So in any of your calls with Attorney

7   McCaughey, did you discuss settlement at all?

8      A.    Settlement was going to be discussed

9   after the debt was validated.

10      Q.    So did you have any discussions with

11   him in which you offered a specific amount of

12   money or he asked for a specific amount of

13   money?

14      A.    The way I look at it, I can't remember

15   if the 97 is 100 percent accurate, that what I

16   thought the debt was was a lot less than the

17   18,000 they were looking for, and that's what I

18   was stating that I owed.  And he told me, you

19   know, with interest and everything else, it was

20   higher.

21      Q.    What did you think that the debt was

22   at that time?

23      A.    I thought it was maybe 9,000 or

24   something.

Page 15

1    A.   That I couldn't tell you.

2    Q.   In May of 2004, would you say you were

3    spending a substantial amount of your time on debt

4    collection matters?

5    A.   I probably was spending less time.   The

6    market, we were doing more closing work, so --

7    Q.   Say in 2004, approximately what percentage

8    of your time was on debt collection work?

9    A.   I would say a little less than half.

10    Q.   Do you happen to know what the law is in

11    Massachusetts regarding a creditor's ability to

12    obtain a Prejudgment Attachment of a debtor's wages?

13    Q.   Yes.

14    A.   As far as I am aware, you cannot do a

15    Prejudgment Attachment of a debtor's wages.

16    Q.   Have you ever, in your law practice in

17    Massachusetts, ever attempted on behalf of a

18    creditor to obtain a Prejudgment Attachment of

19    wages?

20    A.   No.

21    Q.   Do you know what steps a creditor does need

22    to go through in order to obtain any kind of an

23    attachment of a debtor's wages?

24    A.   That's a tricky question.

Page 40

1   Identification.)

2       Q.   This is Exhibit 5.  I will represent to you

3   this is a document that was produced by Attorney

4   Holland in this case.  My initial question to you

5   is, do you recall seeing this document before?

6       A.   I believe this is the credit report that is

7   contained within Mr. Kemp's file.

8       Q.   Is this the credit report you were

9   referring to in your answers to the most recent

10  questions?

11      A.   I believe so, yes.

12      Q.   The question that we left off on, I

13  believe, was my asking you if at the time of the

14  transfer, Mr. Kemp was current in paying any of his

15  debts.  If you can determine the answer to that

16  question from this document, that's what I would

17  like to hear from you.

18      A.   It looks like he was current with America

19  Honda Finance.  Citi.  I am assuming it's Citi

20  Financial.  And his GMAC was current.

21      Q.   Have you fully answered the question?

22      A.   I have answered the ones that say "current

23  account."

24      Q.   Okay.  Just to get it into the record, the

Page 41

1   ones that say "current account," as I look at this,

2   are the General Motors, is that correct?  I'm

3   looking at the top of the second page.

4        A.  I'm trying to remember the code.  They

5   changed the coding.  It starts off with a "B," so I

6   can't remember.  I believe General Motors

7   Corporation.  A straight number of "Cs" means the

8   account is being paid timely without any incident.

9        Q.  You better clarify, what do you mean by

10  "Cs"?

11       A.  America Honda Finance, for example, you see

12  "CCCCCCC."

13       Q.  I see that.

14       A.  That means there is no issue with the

15  account.  Citibank has straight number of "Cs."  The

16  J.C. Penney has "Ns."  It shows it's actually

17  inactive.

18       Q.  Can you tell from this what the balance was

19  on the J.C. Penney account?

20       A.  It says "219."  I'm sorry, it just says

21  "219."  The second line being "balance of zero."

22       Q.  All right.  What about the debts at the top

23  of the second page of this exhibit, first the

24  General Motors debt.  How does the status look to

Page 42

1    you on that General Motors Corporation?

2         A.   More or less fine.  I mean, there is a "B"

3    and a "1" indicated someplace within the coding.

4         Q.   Based on your current knowledge, it looks

5    like he was up-to-date on that loan?

6         A.   At that time, yes.

7         Q.   What about the next one, First Nationwide

8    Mortgage?

9         A.   Also coding with a "B" and a "1."  But at

10   the time it looks like he was current.

11        Q.   What about Americredit?

12        A.   Also looks like he was current at the time.

13        Q.   The next one is National Tire.

14        A.   It looks like there is no balance at all on

15   the account, so it's paid.  It's open and it's

16   current.  As far as account, no charge on it.

17        Q.   Then we get to one of the debts you were

18   mentioning before, GMAC.  What does it look like to

19   you?

20        A.   It looks completed.

21        Q.   The next one is a mortgage, Dovenmuhl.

22        A.   It indicates it has been paid.

23        Q.   Then Fleet National Bank?

24        A.   Also looks like it's open, nothing due.

Page 43

1    Q.  Going back to the first page of this
2  exhibit, you had mentioned in your testimony that
3  there was a problem with the Discover Card.  Is it
4  fair to say that appears about halfway down the
5  first page?
6    A.  Yes.
7    Q.  Can you tell from looking at that
8  information, what the status was regarding that
9  particular account, the Discover account?
10    A.   It indicates it's a charge-off account
11  purchased by another lender.
12    Q.  The next account down the page is Chase N.
13    A.   That indicates a charge-off also.  It was
14  sold to another lender, or transferred to another
15  lender.
16    Q.  In fact, it says "Sold to PCM," correct?
17    A.  Correct.
18    Q.  And "PCM" is the entity that the Ganick
19  firm represented in the Complaint that is Exhibit A
20  to Exhibit 1, correct?
21    A.  Correct.
22    Q.  Then the next creditor which appears on
23  Page 1 is U.S. Trust, correct?
24    A.  Correct.

Page 44

1    **Q.**  What does the status of that account appear

2    to be to you?

3        A.   It looks like he transferred it to another

4    lender and subsequently paid.

5        **Q.**  Any indication of a delinquency or

6    charge-off on that?

7        A.   No.

8        **Q.**  I don't know about your copy, but my copy

9    is kind of cut off.  There is another Chase account,

10   and that indicates a charge-off, correct?

11       A.   Correct.

12       **Q.**  At the time you drafted the Complaint that

13   is Exhibit A to Exhibit 1, do you know whether or

14   not Mr. Kemp was behind in any of his utility

15   payments?

16       A.   No, not aware.

17       **Q.**  Okay.  What is the date that Exhibit 5 was

18   prepared?  According to the language on there, can

19   you tell from looking at Exhibit 5 when it was

20   prepared?

21       A.   It looks like the request was dated

22   8/14/2003.

23       **Q.**  When you say "the request," what do you

24   mean?

Page 45

1      A.   Any time you request a credit report, it's

2   done electronically.   It's a request done in this

3   case by our client.   They probably printed it from

4   the original file.   I wouldn't know, other than

5   that.

6      Q.   Do you know as of what date this report is

7   current by looking at it?

8      A.   As of 8/14/2003.   I'm not sure how this

9   particular credit reporting agency, how far behind

10  they are on the dates.

11     Q.   I understand.   Is it fair to say the

12  request was made and the report was generated both

13  on the same date?

14     A.   Most likely, yes.

15     Q.   Okay.   At the time you prepared the

16  Complaint which is Exhibit A to Exhibit 1, did you

17  have any other credit reports regarding Mr. Kemp,

18  other than Exhibit 5?

19     A.   No.

20     Q.   At the time you prepared Exhibit A to

21  Exhibit 1, did you have any other information

22  regarding the status of any of Mr. Kemp's debts,

23  other than the information that appears on Exhibit

24  5?

Page 46

1      A.   Well, I had basically the fact the

2  mortgages were outstanding.  The mortgages on the

3  property of 9 Elizabeth Road were outstanding at the

4  time that the Complaint was prepared.

5      Q.   When you say "outstanding," you mean money

6  was owed on them?

7      A.   They weren't paid.  There was no discharge

8  filed on any of the mortgages in question for that

9  property.  So his debt, also in addition, transfer

10  did occur, so any equity in the property was now

11  gone.

12      Q.   Right.  At the time you prepared Exhibit A

13  to Exhibit 1, did you know whether or not the actual

14  monthly payments on those mortgages were up-to-date

15  on not?

16      A.   I honestly do not know, nor did I feel it

17  that significant.

18      Q.   Okay.  Other than the information that you

19  relied on in Exhibit 5 at the time you prepared

20  Exhibit A to Exhibit 1, did you have any other

21  information regarding the payment status of any of

22  Mr. Kemp's other debts?

23      A.   Aside from the one for our client he wasn't

24  paying?

Page 47

1        **Q.**  Correct.

2        A.   No.

3        **Q.**  Is it fair for me to say in Exhibit A to

4    Exhibit 1, the allegation is made that Mr. Kemp's

5    transfer of his interest in the 9 Elizabeth Road

6    property was fraudulent, in violation of General

7    Laws Chapter 109, Section 5?

8        A.   Section 5 is?

9        **Q.**  I'm asking you to remember what's in the

10   Complaint itself.

11       A.   That's what it reads.

12       **Q.**  Okay.  Do you have now the statute in front

13   of you?

14       A.   Yes.

15       **Q.**  Chapter 109A.  I am sure that's a typo in

16   the Complaint.  In the second count of Exhibit A,

17   there are a number of references to General Laws

18   Chapter 109.  Do you see that?  There is a reference

19   in Paragraph 8, and there is one in Paragraph 10.

20   Do you see that?

21       A.   Yes.

22       **Q.**  Is it fair to say the actual statute you

23   were referring to there was Chapter 109A and not

24   109?

Page 34

1          MR. QUAT:  Let's mark this as

2    Exhibit 4.

3               (Exhibit No. 4 marked for

4    Identification.)

5       A.  Basically, according to Massachusetts Law,

6    Section 109A, Section 3, a debtor is insolvent if

7    the sum of the debtor's debts is greater than all

8    the debtor's assets at fair valuation.

9          At the time the property was transferred,

10   that I recall, Mr. Kemp transferred, for the sum of

11   $1, there was an outstanding mortgage for, I believe

12   somewhere around 100,000, then another subsequent

13   mortgage for over 200,000.  His name was on both

14   mortgages, but he transferred his equity in the

15   property to his wife for a dollar.

16          In addition, I believe -- I'm trying to

17   remember -- having no equity in the property, he is

18   now encumbered by several hundred thousand dollars

19   of debt.

20          In addition, according to the credit

21   bureau, he had two charge-offs to Chase, being he

22   had not paid those bills, and one to Discover Card.

23   As such, basically on three consumer accounts he

24   wasn't paying at the time, and were now basically in

Page 35

1    default, and were listed on his credit as a

2    charge-off.

3         And "B" says that debtor is generally not

4    paying his debts as they become due.  He was late to

5    GMAC and many creditors as well.  He wasn't paying

6    his bills as they were coming due.

7         On that basis, I deemed him insolvent,

8    going to the statute, and no other information being

9    available.

10   **Q.**  Okay.  At the time of the transfer, what

11   were Mr. Kemp's assets?

12        A.    There was no real estate listed on the

13   credit bureau.  I would have no other knowledge of

14   his other assets, other than the fact, as I said, he

15   had three charge-off accounts, two for Chase and one

16   for Discover Card.  And his bills were not being

17   paid as they came due, due to the late payment

18   notices on his credit report.

19        **Q.**  Is it fair to say that prior to the

20   transfer, Mr. Kemp owned a piece of property with

21   his wife at 9 Elizabeth Road in Billerica?

22        A.    And he had equity in it.

23        **Q.**  I want to make sure.  Were you aware of any

24   other assets in which he had an interest at the time

Page 36

1   of the transfer of that property?

2        A.   No.

3        Q.   Okay.   What debts did Mr. Kemp have at the

4   time of the transfer of that property?

5        A.   As I said, at the time of the transfer of

6   the property, according to the credit bureau, he had

7   two accounts owed to Chase and one to Discover Card

8   that were not paid that were now charge-off

9   accounts.

10       Q.   Okay.   Did he have any other debts, as far

11  as you can recall?

12       A.   As I said, I believe the credit bureau

13  indicated an outstanding loan to GMAC, which he was

14  paying late.

15       Q.   At the time of the transfer, do you know

16  what the value of Mr. Kemp's assets taken together

17  was?

18       A.   No, I do not.

19       Q.   At the time you drafted the Complaint that

20  is Exhibit 1, did you know what the total value of

21  Mr. Kemp's assets were at the time of the transfer?

22       A.   No, I did not.

23       Q.   At the time you drafted the Complaint, did

24  you know what the total amount of Mr. Kemp's debts

Page 37

1    were at the time of transfer?

2         A.   I knew he was responsible for the mortgage

3    notes outstanding and the balances as indicated on

4    his credit bureau report.

5         Q.   Okay.

6         A.   And of course my client's bill as well.

7         Q.   In the course of drafting the Complaint

8    that is Exhibit A to Exhibit 1, did you do any

9    addition or mathematical computations to compare the

10   value of Mr. Kemp's assets to his debts?

11        A.   Since the client, Mr. Kemp, indicated that

12   he was having money problems at some point during

13   some initial conversation he had with one of the

14   staff attorneys, and the fact that he basically

15   transferred all the equity in the property out for a

16   dollar, and he basically had three credit cards that

17   were now in default, I didn't have any other

18   information to go on.

19        Q.   Is the answer to my question no?

20        A.   No.  Sure.

21        Q.   You alluded to some statement regarding

22   money problems that Mr. Kemp made to a staff

23   attorney.

24        A.   Correct.